**In re CHOCOLATE CONFECTIONARY ANTITRUST LITIGATION.**

**This Document Applies to: All Cases.**

**MDL Docket No. 1935.**
**Civil Action No. 1:08–MDL–1935.**

United States District Court,
M.D. Pennsylvania.

March 4, 2009.

---

***MEMORANDUM***

CHRISTOPHER C. CONNER, District Judge.

This is a multidistrict antitrust matter brought under Section 1 of the Sherman Act, 15 U.S.C. § 1, and various state antitrust and consumer protection statutes. Plaintiffs allege that defendants conspired to fix the prices of chocolate confectionary products in the United States. Defendants, who control approximately 75% of the American market for chocolate candy, allegedly entered pricing agreements, resulting in coordinated price increases on three distinct occasions between 2002 and 2007. Defendants argue that the amended complaints fail to raise a plausible inference of an agreement to fix prices as required by *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Defendants have filed motions to dismiss (Docs. 464, 469, 477) the complaints under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Defendants Cadbury plc, Cadbury Holdings, Mars Canada, Nestlé S.A., and Nestlé Canada have also filed motions to dismiss (Docs. 466, 471, 473, 474) under Rule 12(b)(2) for lack of *in personam* jurisdiction. These defendants contend that they do not sell chocolate candy in the United States, maintain no facilities inside the U.S., and have no pricing authority in the U.S. chocolate market.

For the reasons that follow, the Rule 12(b)(2) motions will be deferred during a period of jurisdictional discovery. The Rule 12(b)(6) motions filed by the remain-

ing defendants will be denied except with respect to certain common law and consumer protection claims. The Rule 12(b)(6) motions filed by Cadbury plc, Cadbury Holdings, Mars Canada, Nestlé S.A. and Nestlé Canada will be deferred until resolution of their jurisdictional challenges.

## I. *Factual Background* [1]

Defendants are members of four multinational corporate families that produce chocolate confectionary products for markets around the globe. Plaintiffs allege that from December 2002 to April 2007 defendants conspired to fix prices in the American chocolate candy market,[2] as evidenced by three synchronized price increases that occurred during the early- and mid–2000s. In August 2008, three putative subclasses of plaintiffs and one group of individual plaintiffs filed consolidated amended complaints against all defendants.

### A. *Defendants' Respective Corporate Structures and Market Shares*

Defendant The Hershey Company (hereinafter "Hershey Global") dominates the American chocolate confectionary market, supplying more than 40% of the chocolate candy sold in the U.S. (Doc. 418 ¶ 19; Doc. 420 ¶ 80; Doc. 448 ¶ 31.) Defendant Hershey Canada, a wholly owned subsidiary of Hershey Global, distributes Hershey products in Canada. (Doc. 418 ¶ 20; Doc. 420 ¶ 50; Doc. 448 ¶ 28.) Hershey Global has integrated its American and Canadian operations, and Hershey North America, a division of Hershey Global,

oversees sales and marketing operations in both countries. (Doc. 418 ¶ 20; Doc. 448 ¶ 30.)

Defendant Mars, Inc. ("Mars Global") possesses a 26% share of the American chocolate candy market. (Doc. 418 ¶ 22; Doc. 420 ¶ 80; Doc. 448 ¶ 38.) In the U.S. and Canada, Mars Global operates through two subsidiaries: defendants Mars Snackfood U.S. LLC ("Mars Snackfood") and Mars Canada, Inc. ("Mars Canada"). (Doc. 418 ¶¶ 23–24; Doc. 420 ¶¶ 53–54; Doc. 448 ¶¶ 36–38.) These subsidiaries collectively form Mars Global's North America division (Doc. 418 ¶¶ 23–24; Doc. 420 ¶¶ 53–54; Doc. 448 ¶¶ 36–38.)

Defendant Nestlé S.A. is the world's largest food and beverage corporation and controls 8% of the American chocolate candy market. (Doc. 418 ¶ 26; Doc. 420 ¶ 80; Doc. 448 ¶ 47.) Nestlé S.A., based in Vevey, Switzerland, does not operate directly in either the United States or Canada. (Doc. 418 ¶ 26; Doc. 420 ¶ 56; Doc. 422 ¶ 10; Doc. 448 ¶ 42.) Rather, its subsidiaries, defendants Nestlé U.S.A., Inc. ("Nestlé U.S.A.") and Nestlé Canada, Inc. ("Nestlé Canada"), market and distribute Nestlé products in the nations for which they are named. (Doc. 418 ¶¶ 27–28; Doc. 420 ¶¶ 57–58; Doc. 422 ¶¶ 9, 11; Doc. 448 ¶¶ 43–44.) Both Nestlé U.S.A. and Nestlé Canada are members of Nestlé S.A.'s Zone Americas division. (Doc. 418 ¶ 26; Doc. 448 ¶ 46.)

Defendant Cadbury plc is also a titan in worldwide chocolate markets. Cadbury plc is the corporate parent of defendant

---

1. In accordance with the standard of review for motions to dismiss under Rule 12(b)(2) and Rule 12(b)(6), the court will present the facts as alleged in the amended complaints. *See infra* Parts II.A, III.A.

2. As used in this memorandum, "chocolate candy" and "chocolate confectionary prod-

ucts" refer to chocolate bars and other mass-produced chocolate confections manufactured and packaged for sale to retail consumers. Examples of these products include Nestlé Crunch®, Hershey's Kisses®, M & M's®, and Cadbury Creme Eggs®.

Cadbury Holdings Ltd. ("Cadbury Holdings") and defendant Cadbury Adams Canada, Inc. ("Cadbury Canada"). (Doc. 418 ¶¶ 30–32; Doc. 420 ¶¶ 60–62; Doc. 422 ¶ 13–14; Doc. 448 ¶ 51–53.) Cadbury Canada produces and distributes Cadbury products in Canada. (Doc. 418 ¶ 32; Doc. 420 ¶ 62; Doc. 422 ¶ 14; Doc. 448 ¶ 53.) In the U.S., Hershey Global distributes Cadbury-branded products under license agreements with Cadbury Holdings and Cadbury plc. (Doc. 418 ¶¶ 30, 89; Doc. 420 ¶¶ 61, 82; Doc. 422 ¶¶ 13, 61; Doc. 448 ¶¶ 51, 107.g.) The amended complaints contain few other details about the role that Cadbury plc, Cadbury Holdings, and Cadbury Canada play in the American market.

### B. *Integration of the American and Canadian Markets for Chocolate Candy*

Defendants collectively control approximately 75% of the chocolate candy market in the U.S. and 64% in Canada. (Doc. 418 ¶ 52; Doc. 420 ¶ 80; Doc. 422 ¶ 35; Doc. 448 ¶ 107.a.) Plaintiffs contend that these markets are tightly interwoven and consist of homogenous, interchangeable chocolate candy products. (Doc. 418 ¶ 52; Doc. 420 ¶ 80; Doc. 422 ¶ 35; Doc. 448 ¶ 107.a.) They bolster this assertion with trade statistics that allegedly demonstrate synergism between the markets. For example, in 2003 the United States imported approximately $1.8 billion in confectionary products, 40% of which consisted of chocolate candy. (Doc. 418 ¶ 49.) According to the amended complaints, much of this chocolate originated in Canada, where defendants manufactured and packaged it for sale in the United States. (Doc. 418 ¶¶ 49, 53; Doc. 422 ¶ 40; Doc. 448 ¶ 107.h) The U.S. also ships chocolate products to Canada. American manufacturers purportedly supply approximately 45% of Canada's chocolate candy imports. (Doc. 420 ¶ 90; Doc. 422 ¶ 40.)

Defendants have allegedly integrated their American and Canadian operations. Plaintiffs assert that defendants have developed manufacturing and distribution systems designed to serve consumers across international borders. Defendants supply similar chocolate products to both markets. In addition, defendants have created North American divisions that oversee U.S. and Canadian operations. (Doc. 418 ¶¶ 82–83; Doc. 420 ¶ 92; Doc. 422 ¶¶ 85–89; Doc. 448 ¶ 107.b.)

According to the pleadings, Hershey Global has instituted a single corporate division to coordinate all North American sales and marketing, and the company aggregates operations in the United States, Canada, Mexico, and Brazil for purposes of its reporting obligations under the Securities Exchange Act of 1934. (Doc. 418 ¶¶ 83–84; Doc. 420 ¶ 92; Doc. 422 ¶ 85; Doc. 448 ¶ 107.b.) Hershey allegedly groups these nations based upon "similar economic characteristics, and similar products and services, production processes, types of consumers, distribution methods, and the similar nature of the regulatory environment in each location." (Doc. 418 ¶ 84.) Similarly, Mars Canada manufactures and packages chocolate candy products in Canada for sale in the United States. (Doc. 418 ¶ 53; Doc. 420 ¶ 53; Doc. 422 ¶ 21; Doc. 448 ¶¶ 37, 39.) Either Mars Canada or another member of Mars Global's corporate family purportedly manages the sale of these products. (Doc. 418 ¶ 22, 24, 53; Doc. 420 ¶ 52–53; Doc. 422 ¶ 20–21; Doc. 448 ¶¶ 37, 39.) Nestlé S.A., Cadbury plc, and Cadbury Holdings likewise fuse the United States and Canada for purposes of corporate operations. Nestlé's Zone Americas is the company's leading sales territory and includes the U.S., Canada, Mexico, and Central and South America. (Doc. 418 ¶¶ 86–87; Doc. 420 ¶ 92; Doc. 422 ¶ 88; Doc. 448 ¶ 107.b.)

And the president of Cadbury's Americas Confectionery division possesses ultimate responsibility for the daily management and operation of the Cadbury chocolate business in both the United States and Canada. (Doc. 418 ¶¶ 86–87; Doc. 420 ¶ 92; Doc. 422 ¶ 87; Doc. 448 ¶ 107.b.)

Licensing agreements among defendants further contribute to the coalescence of these markets. Cadbury Holdings and Hershey Global have executed asset purchase and trademark licensing agreements [3] under which Hershey possesses an exclusive license to manufacture and market Cadbury-branded products in the United States. (Doc. 418 ¶¶ 30, 89; Doc. 420 ¶¶ 61, 82; Doc. 422 ¶¶ 13, 61; Doc. 448 ¶¶ 51, 107.g.) Brands subject to the license include York Peppermint Patties ™, Mounds®, and Almond Joy®. (Doc. 418 ¶ 30; Doc. 420 ¶ 61; Doc. 422 ¶ 13; Doc. 448 ¶ 51.) Hershey also has a similar licensing arrangement for certain Nestlé-branded products including Kit–Kat® and Rolo®. (Doc. 418 ¶ 90; Doc. 420 ¶ 82; Doc. 422 ¶ 62; Doc. 448 ¶ 107.g.) Under the Hershey–Cadbury agreements, Hershey Global remits quarterly royalty payments to Cadbury plc and Cadbury Holdings, which may audit Hershey's accounting records, observe its manufacturing processes, and test its products for quality. (Doc. 478–6 at 3, 13–14; Doc. 478–8 at 10, 16–18; Doc. 418 ¶¶ 89–90; Doc. 420 ¶ 84.) The agreements require personnel from both companies to meet on a quarterly basis to discuss marketing, promotion, and development of Cadbury-branded products. (Doc. 478–6 at 16; Doc. 478–8 at 18–19.)

In contrast to monolithic supply points, demand in the American and Canadian markets for chocolate candy is diffuse. (Doc. 418 ¶ 55; Doc. 420 ¶ 80; Doc. 422 ¶ 36; Doc. 448 ¶¶ 65, 103.) Direct buyers include supermarkets, convenience stores, retail chains, and other wholesale customers, none of which possesses a dominant share of the demand market. (Doc. 418 ¶ 55; Doc. 420 ¶ 80; Doc. 422 ¶ 36; Doc. 448 ¶ 103.) These disparate purchasers form the markets' predominant distribution channels with no single buyer capable of exercising power over defendants' pricing structures. (Doc. 418 ¶ 55; Doc. 420 ¶ 80; Doc. 422 ¶ 36; Doc. 448 ¶ 104.)

Material to the antitrust claims, the supply market for chocolate candy features formidable entry barriers. (Doc. 418 ¶ 56; Doc. 420 ¶ 89; Doc. 422 ¶ 42; Doc. 448 ¶ 63.) Confectionery is a highly technical business, requiring significant capital outlay for manufacturing facilities, engineering expertise, and distribution channels to compete on a market-wide scale. (Doc. 418 ¶ 56; Doc. 420 ¶ 89; Doc. 422 ¶ 42; Doc. 448 ¶ 63.) New entrants must also invest considerable sums to promote new products and build brand loyalty among consumers presented with a wide selection of interchangeable goods. (Doc. 418 ¶¶ 55–57; Doc. 420 ¶ 89; Doc. 422 ¶¶ 36–39; Doc. 448 ¶ 64.) In contrast, an established market player can expand production at will. (Doc. 422 ¶ 43; Doc. 448 ¶ 66.) Market leaders, including defendants, typically operate at less than full capacity,

---

**3.** Cadbury Holdings and Hershey Global have executed three separate agreements. Pursuant to an asset purchase agreement, dated July 22, 1988, Hershey Global's predecessor in interest purchased all assets owned by the then-existing U.S. division of the Cadbury business portfolio. (*See* Doc. 478 at 14.) Two trademark licensing agreements, both dated August 25, 1988, granted Hershey Global the exclusive right to sell Cadbury-branded products in the U.S. (*See* Doc. 478–4 at 24; Doc. 478–7 at 21.) The parties have submitted all three agreements, which span eleven separate docket entries. (*See* Docs. 478 through 478–11.) For ease of identification, the court will cite the agreements by referencing the document and page numbers assigned by the Electronic Case Filing system.

giving them the ability to compete against one another by increasing output and by launching new products. (Doc. 422 ¶ 43; Doc. 448 ¶ 66.)

## C. *Price Increases in the U.S. Chocolate Confectionary Market*

Plaintiffs contend that this cross-national market garrisoned within high entry barriers facilitated defendants' collusive pricing. From the mid–1990s until 2002, chocolate candy prices in the United States remained stable. (Doc. 418 ¶ 59; Doc. 448 ¶ 95.) None of the defendants implemented permanent price increases during this period because a unilateral increase would have caused a decline in sales as consumers purchased competitors' products at lower prices. (Doc. 448 ¶ 95.) Hence, plaintiffs assert that no defendant could have raised prices without first confirming that other defendants would reciprocate the increase.

The first allegedly anticompetitive price jump occurred on December 9, 2002, when Mars instituted a 10.7% increase for its standard-size chocolate bars and a 22% increase on packages of six bars. (Doc. 418 ¶ 60; Doc. 420 ¶ 94.a; Doc. 422 ¶ 45; Doc. 448 ¶ 79.) Two days later, Hershey followed Mars's lead, boosting prices by 10.7% for standard-size bars and 7.6% for six-packs.[4] (Doc. 418 ¶ 61; Doc. 420 ¶ 94.a; Doc. 422 ¶ 46; Doc. 448 ¶ 80.) Another two days saw an upsurge of 10.3% for Nestlé's standard-size bars.[5] (Doc. 418 ¶ 62; Doc. 420 ¶ 94.a; Doc. 422 ¶ 47; Doc.

448 ¶ 81.) Defendants allegedly reaped extensive financial benefits from this initial price swell despite stable costs and stagnating demand. For example, in July 2003 Hershey Global reported second-quarter net profits of $71.5 million, an increase of $8.4 million compared with the same period for 2002. (Doc. 418 ¶¶ 80–81; Doc. 420 ¶ 102; Doc. 422 ¶ 48; Doc. 448 ¶ 98.) Representatives of Hershey Global publicly acknowledged that this growth in profits was attributable, in part, to the December 2002 price increase. (Doc. 418 ¶ 80; Doc. 422 ¶ 48; Doc. 448 ¶ 98.)

Prices climbed again on November 19, 2004, when Mars announced increases of between 2.9% and 15.6% on variously sized bags of chocolate candy. (Doc. 418 ¶ 65; Doc. 420 ¶ 94.b; Doc. 422 ¶ 49; Doc. 448 ¶ 82.) The next month, Hershey promulgated a 5.5% rise in the price of standard-size bars, which Mars followed with an identical increase. (Doc. 418 ¶¶ 65–66; Doc. 420 ¶ 94.b; Doc. 422 ¶¶ 49–50; Doc. 448 ¶¶ 83–84.) Hershey also raised prices for bags of chocolate candy between 2.5% and 7.6%.[6] (Doc. 418 ¶ 66; Doc. 422 ¶ 50; Doc. 448 ¶ 84.) Prices for Nestlé standard-size bars and bags of chocolate candy grew by 5.7% the next week.[7] (Doc. 418 ¶ 67; Doc. 420 ¶ 94.b; Doc. 422 ¶ 51; Doc. 448 ¶ 85.)

A third series of price increases commenced in the spring of 2007 with Mars again serving as bellwether. On March 23, 2007, Mars raised the prices of its

---

**4.** Hershey simultaneously raised prices for king-size bars and ten-packs by 13.6% and 15.4%. (Doc. 418 ¶ 61; Doc. 420 ¶ 94.a; Doc. 422 ¶ 46; Doc. 448 ¶ 80.)

**5.** Prices for other Nestlé sizes also jumped, including a 14.5% increase on king-size bars and a 16.8% increase on ten-packs. (Doc. 418 ¶ 62; Doc. 422 ¶ 47; Doc. 448 ¶ 81.)

**6.** Hershey implemented price increases on other products at the same time: its king-size

bars surged by 4.7%, its six-packs by 8.5%, and its variety packs by 5.5%. (Doc. 418 ¶ 66; Doc. 420 ¶ 94.b; Doc. 422 ¶ 50; Doc. 448 ¶ 84.)

**7.** Nestlé contemporaneously raised prices by 4.8% on its king-size bars and 7.7% on six-packs. (Doc. 418 ¶ 67; Doc. 420 ¶ 94.b; Doc. 422 ¶ 51; Doc. 448 ¶ 85.)

standard-size and king-size bars by 5.3% and 4.5% respectively. (Doc. 418 ¶ 69; Doc. 420 ¶ 94.c; Doc. 422 ¶ 53; Doc. 448 ¶ 87.) Hershey joined Mars on April 4, raising standard-size bar prices by 5.2% and king-size bar prices by 4.5%. (Doc. 418 ¶ 70; Doc. 420 ¶ 94.c; Doc. 422 ¶ 54; Doc. 448 ¶ 88.) Nestlé completed the series the following day with price hikes of 5.4% on standard-size chocolate bars and 4.6% on king-size bars and six-packs.[8] (Doc. 418 ¶ 71; Doc. 420 ¶ 94.c; Doc. 422 ¶ 55; Doc. 448 ¶ 89.)

Throughout the period of these increases, the cost of defendants' raw materials remained stable, benefitting from relative calm in commodity markets as well as defendants' investment in futures contracts as a hedge against price fluctuations. (Doc. 418 ¶¶ 59, 79; Doc. 420 ¶ 97; Doc. 422 ¶ 58; Doc. 448 ¶ 91.) Energy costs also remained stable, (Doc. 418 ¶ 79), but demand for chocolate candy products waned as consumers sought healthier snack options. (Doc. 418 ¶¶ 75, 80; Doc. 420 ¶ 91; Doc. 422 ¶ 57; Doc. 448 ¶ 96.)

## D. Defendants' Pricing Conduct in the Canadian Market

Plaintiffs contend that evidence of defendants' price-fixing agreements in the Canadian chocolate confectionary market corroborates the conspiracy that allegedly occurred in the United States. In July 2007, Canadian antitrust officials commenced an investigation into alleged price fixing by Cadbury Canada, Hershey Canada, Mars Canada, and Nestlé Canada (hereinafter "the Canadian defendants"). The investigation purportedly revealed that Glenn Stevens ("Stevens"), president of non-defendant candy distributor IT-WAL, Inc., provided the catalyst for a Canadian price-fixing agreement by transmitting several letters to senior managers of the Canadian defendants. (Doc. 418 ¶ 100; Doc. 420 ¶ 110.c; Doc. 422 ¶ 82; Doc. 448 ¶ 113.) The recipients included Bob Leonidas ("Leonidas"), president and chief executive officer of Nestlé Canada, as well as executives of Cadbury Canada, Hershey Canada, and Mars Canada. (Doc. 418 ¶ 100; Doc. 420 ¶ 110.f; Doc. 422 ¶ 82; Doc. 448 ¶ 113.) The initial letter, entitled "TAKE ACTION NOW!!," proposed that defendants reduce trade spending, which is the practice of providing promotional discounts and rebates to consumers:

At the 'end of the day' it is only the suppliers' control and discipline of the trade spending that can restore functionality in the marketplace. The problem is completely out of control on the part of the suppliers. I am being forced to reexamine how we operate in the market and I am not sure it would be in the best interests of [Cadbury Canada, Hershey Canada, Mars Canada, and Nestlé Canada.]

*I urge you to meet and take action* before this chocolate bar 'bubble bursts.'

(Doc. 173, Ex. E ¶ 5.7;[9] Doc. 418 ¶ 100; Doc. 420 ¶ 110.f; Doc. 422 ¶ 83; Doc. 448 ¶ 113) (emphasis added.)

---

8. Mars also raised prices for packages of Dove brands by 15% during the third round of increases. (Doc. 418 ¶ 69; Doc. 422 ¶ 53; Doc. 448 ¶ 87.)

9. Exhibits D and E to Docket Entry No. 173 are the sworn statements that Daniel Wilcock, an attorney for the Canadian Competition Bureau, prepared in furtherance of the Bureau's investigation into alleged price-fixing activities in Canada. Plaintiffs' amended complaints rely upon these statements to describe defendants' alleged price-fixing activities, and defendants do not dispute the authenticity of these documents. (Doc. 477 at 30 n. 7.) The court may therefore consider them when ruling on the motions to dismiss. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997).

During the ensuing fifteen months, the Canadian defendants received more than twenty additional "Take Action Now" notices (hereinafter "TAN notices") from Stevens evidencing various facets of the alleged price-fixing conspiracy in the Canadian market. (Doc. 420 ¶ 110.h-.o; Doc. 448 ¶¶ 115–16.) An April 2002 TAN notice reflects that the Canadian defendants instituted audit procedures and hired third-party investigators to curtail retail discounting and agreed to "immediate termination" of buyers that failed to adhere to their trade spending policies. (Doc. 173, Ex. E ¶ 5.10.) TAN notices dated December 2002 document that the Canadian defendants had undertaken "concerted and committed efforts to clean up the dysfunctional retail trade spending" in the Canadian market by reducing or eliminating 2-for–99¢ and 3-for–99¢ promotions. (Doc. 173, Ex. E ¶ 5.12.) During this time period, defendants' executives in the United States were purportedly aware of and condoned the price-control efforts in Canada. (Doc. 420 ¶ 65; Doc. 448 ¶ 107.c.)

In February 2004, Leonidas met with a senior executive (hereinafter "Cooperating Individual 1" or "CI–1") of a company (hereinafter "the cooperating party") that would later assist with the Canadian antitrust investigation.[10] (Doc. 420 ¶ 109.a; Doc. 422 ¶ 74; Doc. 448 ¶ 121.) Leonidas and Cooperating Individual 1 discussed trends in trade spending and agreed that such expenditures should be further reduced. (Doc. 420 ¶ 109.a; Doc. 422 ¶ 74; Doc. 448 ¶ 121.) The meeting caused CI–1

to believe that he and Leonidas shared a common perspective on trade spending, and CI–1 understood that he had "an open line to call Leonidas if there were any issues in the market, including trade spend [sic] practice." (Doc. 420 ¶ 109.a; Doc. 422 ¶ 74; Doc. 448 ¶ 121 (all cited complaints quoting Doc. 173, Ex. D ¶ 5.21)).

The Canadian defendants' pricing communications sharpened in June 2005, when Cooperating Individual 1 met with Leonidas at a trade association convention. Leonidas informed CI–1 that Nestlé Canada "[took] pricing seriously," that the company planned to implement a price increase in the near future, and that Leonidas wanted CI–1 to "hear it from the top" of Nestlé Canada's leadership.[11] (Doc. 418 ¶ 101; Doc. 420 ¶ 109.b; Doc. 448 ¶ 123.) CI–1 reciprocated Leonidas's sentiment and believed that Leonidas would have concluded that the cooperating party would follow a price increase led by Nestlé Canada. (Doc. 420 ¶ 109.c; Doc. 448 ¶ 123.)

Emails exchanged among employees of the cooperating party confirm that the Canadian defendants exchanged pricing information. The following is a verbatim excerpt of one of these emails:

"At ITWAL I was informed by a reliable source that both Nestlé and [Mars Canada] have been to customers hinting at 2005 price increases. No details or confirmation. I suggested that we would seriously consider appropriate actions once firm details known, and that I

---

10. The cooperating party is widely presumed to be Cadbury Canada, (*see, e.g.,* Doc. 420 ¶ 108), though the current record does not confirm its identity. The court has retained the anonymous descriptors utilized in Wilcock's sworn statements to identify the company and employees who participated in the Canadian antitrust investigation.

11. Cooperating Individual 1 did not recall the precise words that Leonidas used during the encounter but informed Canadian antitrust authorities that Leonidas stated, "I want you to hear it from the top—I take my pricing seriously" or "We are going to take a price increase and I want you to hear it from the top" or language to similar effect. (Doc. 418 ¶ 101; Doc. 420 ¶ 109.c; Doc. 448 ¶ 123.)

would be concerned about the other leading player not following Which my contact said they would inquire about. This is similar to info we had picked up a couple months ago . . . ."

(Doc. 420 ¶ 109.b; Doc. 448 ¶ 122 (all cited complaints quoting Doc. 173, Ex. D ¶ 5.22)). CI–1 later received documentation reflecting Nestlé Canada's plans to increase chocolate candy prices during 2005. (Doc. 420 ¶¶ 109.d-.h; Doc. 422 ¶ 75; Doc. 448 ¶¶ 123–25.) The cooperating party announced a price increase on July 29, 2005 in accordance with Nestlé Canada's proposed increase. (Doc. 420 ¶ 109.i.) Following suit, Hershey Canada and Mars Canada announced increases before the end of 2005. (Doc. 420 ¶ 109.j-.k.)

CI–1 also communicated with representatives of Hershey Canada and Hershey Global during the alleged Canadian price-fixing conspiracy. In early 2007, Hershey Global appointed Eric Lent ("Lent"), vice president of its American confectionery operations, to head Hershey Canada. (Doc. 173, Ex. D ¶ 5.45.) Following his transfer, Humberto Alfonso ("Alfonso"), chief financial officer of Hershey Global, transmitted an email to CI–1 with Lent's new contact information. Alfonso's email read, in pertinent part, as follows:

> As we discussed, Hershey has recently appointed Eric Lent as Vice President and General Manager for the Canada business. In keeping with the good advice from 'The Godfather,' keep close to your competition, I am including contact info below in an effort to introduce you both. All kidding aside, I know Eric is looking forward to meeting you.

(Doc. 418 ¶ 103; Doc. 420 ¶ 109.t; Doc. 422 ¶ 80; Doc. 448 ¶ 132 (all complaints quoting Doc. 173, Ex. D ¶ 5.45)). By late 2007, Lent had obtained or solicited pricing information from Leonidas and his counterparts at Mars Canada and the cooperating party. (Doc. 418 ¶ 104; Doc. 420 ¶ 109.-v-.w; Doc. 422 ¶ 80; Doc. 448 ¶ 134.)

Plaintiffs contend that the Canadian defendants' alleged misconduct lends particular credence to their claims of price fixing in the American market. They assert that the fluidity between the two markets, the integration of defendants' Canadian and American corporate structures, and fusion of U.S. and Canadian manufacturing and distribution channels provided the means to implement an inter-market price-fixing conspiracy. Plaintiffs aver that all defendants regularly participate in trade associations and conferences and subscribe to industry publications, providing ready fora in which to exchange pricing information. (Doc. 418 ¶ 48, 92–97; Doc. 420 ¶ 77; Doc. 422 ¶ 64, 90–91; Doc. 448 ¶¶ 102, 106, 120.)

### E. *Procedural History*

A total of eighty-seven actions are currently affiliated with the above-captioned multidistrict litigation. The Judicial Panel on Multidistrict Litigation consolidated all pretrial matters in the Middle District of Pennsylvania on April 7, 2008, 542 F.Supp.2d 1376, pursuant to 28 U.S.C. § 1407(a). (*See* Doc. 1.) Three putative subclasses and one group of individual plaintiffs filed amended complaints on August 13 and 14, 2008, and the instant motions to dismiss (Docs. 464, 466, 469, 471, 473, 474, 476) followed on September 29, 2008.

Cadbury plc, Cadbury Holdings, Mars Canada, Nestlé S.A., and Nestlé Canada move to dismiss the complaints for lack of personal jurisdiction. All defendants move for dismissal on the ground that the amended complaints fail to allege facts demonstrating a plausible right to relief under *Twombly*. The parties have fully briefed these issues, and the court received the benefit of approximately five

hours of oral argument on January 16, 2009.[12]

## II. Motions to Dismiss for Lack of Personal Jurisdiction

Cadbury plc, Cadbury Holdings, Mars Canada, Nestlé S.A., and Nestlé Canada (hereinafter collectively "the Rule 12(b)(2) defendants") move for dismissal under Rule 12(b)(2) for lack of personal jurisdiction. These defendants contend that they performed no pricing activity in the U.S. giving rise to specific jurisdiction and that their contacts with the nation as a whole fail to confer general jurisdiction over them.

### A. Standard of Review Applicable Rule 12(b)(2) Motions

■ Motions to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), like those for failure to state a claim under Rule 12(b)(6), require the court to accept as true the allegations of the pleadings and all reasonable inferences therefrom. *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir.2002). However, unlike Rule 12(b)(6), Rule 12(b)(2) does not limit the scope of the court's review to the face of the pleadings. *See id.*; *Carteret Sav. Bank, F.A. v. Shushan*, 954 F.2d 141, 142 & n. 1 (3d Cir.1992). Consideration of affidavits submitted by the parties is appropriate and, typically, necessary. *Patterson by Patterson v. FBI*, 893 F.2d 595, 603–04 (3d Cir. 1990).

■ Although plaintiffs bear the ultimate burden of proving personal jurisdiction by a preponderance of the evidence, such a showing is unnecessary at the preliminary stages of litigation. *Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir.1992). Rather, plaintiffs must merely allege sufficient facts to establish a prima facie case of jurisdiction over the person. *Id.* Once these allegations are contradicted by an opposing affidavit, however, plaintiffs must present similar evidence in support of personal jurisdiction.[13] *Carteret Sav. Bank*, 954 F.2d at 142 & n. 1, 146; *Patterson*, 893 F.2d at 603–04. "[A]t no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of in personam jurisdiction.... Once the motion is made, plaintiff must respond with actual

12. The court commends counsel for the insightful advocacy contained in their briefs and displayed at oral argument. Counsels' written submissions thoroughly canvassed pertinent areas of law, and these materials clearly represent the collaborative work of many capable attorneys. The court expresses its appreciation to all counsel involved in these efforts.

13. The court is aware of case law suggesting that plaintiff may not rely on the pleadings alone but must produce affidavits or other affirmative evidence to overcome a jurisdictional challenge under Rule 12(b)(2). *See, e.g., Rodi v. S. New Eng. Sch. of Law*, 255 F.Supp.2d 346, 348 (D.N.J.2003). However, this misstates plaintiff's burden. If the moving party fails to submit evidence contravening the allegations of the complaint, the court is bound to accept plaintiff's allegations regardless of whether plaintiff presents further evidence in support thereof. *See Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir.2004) (observing that, unless the court hears evidence on the jurisdictional issues, all allegations must be taken as true for purposes of assessing whether the plaintiff has established a prima facie case of jurisdiction); *Carteret Sav. Bank*, 954 F.2d at 142 n. 1 (stating that the "plaintiff need only plead [a] prima facie case to survive the initial [Rule 12(b)(2)] motion, but must eventually establish jurisdiction by a preponderance of the evidence"). In other words, although the burden of persuasion always lies with the non-moving party, the burden of production rests initially with the party moving for dismissal under Rule 12(b)(2).

proofs, not mere allegations." *Patterson,* 893 F.2d at 604. When plaintiff responds with affidavits or other evidence in support of its position, however, the court is bound to accept these representations and defer final determination as to the merits of the allegations until a pretrial hearing or the time of trial. *Carteret Sav. Bank,* 954 F.2d at 142 n. 1 (stating that the "plaintiff need only plead [a] prima facie case to survive the initial [Rule 12(b)(2)] motion, but must eventually establish jurisdiction by a preponderance of the evidence") (citing *Behagen v. Amateur Basketball Ass'n,* 744 F.2d 731, 733 (10th Cir.1984)).

**B.** *Discussion*

 A federal court entertaining a suit must possess one of two forms of personal jurisdiction over each defendant. The first type of jurisdiction, known as specific jurisdiction, requires that the plaintiff's claim arise from the defendant's contacts with the forum in which the court sits. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Telcordia Tech Inc. v. Telkom S.A.,* 458 F.3d 172, 177 (3d Cir.2006). In contrast, the court may exercise general jurisdiction over a defendant who possesses systematic and continuous contacts with the forum regardless of whether the plaintiff's claim derives from the defendant's in-forum activities. *Helicopteros,* 466 U.S. at 415 n. 9, 104 S.Ct. 1868; *Marten v. Godwin,* 499 F.3d 290, 296 (3d Cir.2007). The court must determine whether to exercise either form of jurisdiction in light of the "relationship among the defendant, the forum, and the litigation." *Helicopteros,* 466 U.S. at 414, 104 S.Ct. 1868 (1984) (quoting *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)). When a

statute such as the Sherman Act permits nationwide service of process,[14] the Fifth Amendment Due Process Clause guides the court's personal jurisdiction inquiry. *Max Daetwyler Corp. v. R. Meyer,* 762 F.2d 290, 295 (3d Cir.1985); *Holland v. King Knob Coal Co.,* 87 F.Supp.2d 433, 436 (W.D.Pa.2000).

**1.** *Specific Jurisdiction*

 Specific jurisdiction allows the court to adjudicate claims related to defendants' contacts with the forum. Three alternative theories allow a court to acquire specific jurisdiction over a defendant. First, under principles of purposeful availment, the court may exercise jurisdiction over a defendant that has directed its activities into a forum, thereby producing the alleged injury. Second, the stream-of-commerce theory provides jurisdiction over an out-of-forum defendant if plaintiff's in-forum injury arises from a product that defendant placed into channels of commerce. Third, the effects test announced in *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), confers jurisdiction over a defendant whose tortious conduct performed outside the forum produced effects within the forum. Plaintiffs argue that each theory supplies jurisdiction over the Rule 12(b)(2) defendants.

**a.** *Purposeful Availment*

 Under purposeful availment doctrine, a court may exercise specific jurisdiction if (1) the defendant purposefully directs its activities into a forum, (2) the case arises from those activities, and (3) the exercise of jurisdiction "comport[s] with 'fair play and substantial justice.'" *O'Connor v. Sandy Lane Hotel Co.,* 496 F.3d 312, 317 (3d Cir.2007) (quoting *Burg-*

**14.** Section 12 of the Clayton Act, 15 U.S.C. § 22, authorizes nationwide service of process in antitrust cases, including those brought under § 1 of the Sherman Act.

*er King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (alteration in original)). The purposeful availment and relatedness inquiries are often described collectively as requiring "minimum contacts" between the defendant and the relevant forum. *See, e.g., Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 451 (3d Cir.2003) (quoting *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 109, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (plurality opinion)). If, as in the instant case, a federal statute authorizes nationwide service of process,[15] the court appraises the defendant's contacts with the United States as a whole. *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 298 (3d Cir.2004).

▬ The first component of the jurisdictional inquiry assays whether the defendant "availed[ed] himself of the privilege of conducting activities within the forum." *O'Connor*, 496 F.3d at 317 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)); *see also World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). It requires the defendant to invoke the forum's laws by performing a volitional act directed toward the forum. *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (plurality opinion); *Pinker*, 292 F.3d at 370.

▬ Second, the plaintiff's claim must arise from one of the defendant's forum-related activities. *Marten*, 499 F.3d at 296 (internal quotation omitted). The inquiry ensures that the defendant's "jurisdictional exposure" remains proportionate to its in-forum activities. *O'Connor*, 496

F.3d at 323; *Leone v. Cataldo*, 574 F.Supp.2d 471, 480 (E.D.Pa.2008) ("[T]he cost of enjoying the benefits of a forum is specific jurisdiction."). The link between the defendant's action and the plaintiff's claim need not rise to the level of proximate causation, but the connection must be "intimate enough to keep the quid pro quo [between in-forum activity and jurisdictional exposure] proportional and personal jurisdiction reasonably foreseeable." *O'Connor*, 496 F.3d at 323; *Watiti v. Walden Univ.*, No. Civ.A. 07–4782, 2008 WL 2280932, at *9 (D.N.J. May 30, 2008).

▬ Third, minimum contacts alone will not confer personal jurisdiction over the defendant.[16] The plaintiff must also establish that the exercise of jurisdiction harmonizes with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). At this stage of the analysis, the court evaluates the reasonableness of jurisdiction in light of a variety of interests, including burden that litigation places on the defendant, the forum's interest in the litigation, plaintiff's interest in obtaining convenient relief, the interest of the interstate judicial system in efficient resolution of controversies, and "the shared interests of the several States in furthering fundamental substantive social policies." *Pinker*, 292 F.3d at 370 (quoting *Burger King*, 471 U.S. at 477, 105 S.Ct. 2174). No single factor is dispositive of the jurisdictional analysis. *Burger King*, 471 U.S. at 485, 105 S.Ct. 2174 ("We ... reject any talismanic jurisdictional formulas...."); *Mellon Bank*, 960 F.2d at 1224–25. In federal question cases, when

---

**15.** *See supra* note 14.

**16.** While minimum contacts alone are insufficient to support personal jurisdiction, a defendant that possesses minimum contacts "must make a compelling case that litigation in [the

forum state] would be unreasonable and unfair" to prevent jurisdiction from attaching. *O'Connor*, 496 F.3d at 325 (internal quotation omitted).

concerns of comity among the states are less pronounced, courts should consider the policies of the federal laws from which the dispute arises. *Pinker*, 292 F.3d at 370–71.

■ Turning to the case *sub judice*, the moving defendants challenge the court's personal jurisdiction over them and have supplied affidavits in support of their motions. Mars Canada attests that it is not registered to transact business in the United States, maintains no physical presence or employees here, sells no products in the U.S., and exercises no control over the prices of products sold by its American counterparts. (Doc. 472 ¶¶ 6–10.) Nestlé S.A.'s contacts with the American chocolate market are similarly limited, (Doc. 479, Ex. A ¶¶ 5–11), as are those of Nestlé Canada, (Doc. 479, Ex. B ¶¶ 5–12). Cadbury plc, as a holding company, does not sell chocolate products anywhere in the world, (Doc. 468 ¶ 7), and neither Cadbury plc nor Cadbury Holdings maintain bank accounts, employees, manufacturing facilities, or distribution centers in the United States, (*id.* ¶¶ 18–26). Moreover, the licensing agreements between Cadbury Holdings and Hershey Global do not allow the Cadbury entities to control U.S. pricing or create an obligation to consult about the protocols used to price Cadbury-licensed products.

Plaintiffs therefore incur the burden of rebutting defendants' asseverations "through sworn affidavits or other competent evidence." *Patterson*, 893 F.2d at 604–05. Plaintiffs, however, rely in large measure upon their amended complaints, which describe an integrated market between the United States and Canada and allege that defendants "sold and/or made available for purchase Chocolate Candy to purchasers in the United States." [17] (Doc 418 ¶¶ 24, 26, 28, 30–31; Doc. 420 ¶¶ 53, 56, 58, 60–61; Doc. 422 ¶¶ 10–11, 13, 15, 21; Doc. 448 ¶¶ 35, 37, 39, 42, 44, 51–52); *see also supra* Part I.B; (Doc. 520 at 40–41; Doc. 523 at 24–25). Plaintiffs may not repose upon their pleadings in this manner. Rather, they must counter defendants' affidavits with contrary *evidence* in support of purposeful availment jurisdiction.[18] *Patterson*, 893 F.2d at 604–05;

---

**17.** During oral argument, counsel for Nestlé S.A., Nestlé U.S.A., and Nestlé Canada observed that the amended complaints muddle the jurisdictional inquiry by referring to parent and subsidiary corporations collectively as "Mars," "Nestlé," and "Cadbury." (Doc. 571 at 32.) The court agrees. This pleading practice—while permissible under the Federal Rules of Civil Procedure—disadvantages plaintiffs when responding to the Rule 12(b)(2) motions, which require that plaintiffs establish personal jurisdiction as to *each particular* corporate defendant. *See Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 101 (3d Cir.2004) ("[T]he specific jurisdiction determination is both claim-specific, ... and defendant-specific." (citations omitted)). Plaintiffs will be required to demonstrate that *each* of the moving defendants *individually* possesses sufficient contacts with the United States to warrant exercise of personal jurisdiction regardless of whether their corporate families, considered as a whole, possesses such contacts.

**18.** In this regard, a Rule 12(b)(2) motion differs significantly from one under Rule 12(b)(6), which requires the court to adopt plaintiffs' allegations regardless of defendants' contrary evidence. *See Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 66 n. 9 (3d Cir.1984); *Eagle Computer Assocs. v. Chesapeake Software Servs., Inc.*, No. 99-CV-2583, 1999 WL 1030441, at *1 (E.D.Pa. Nov. 12, 1999). The court thus credits plaintiffs' averments of fusion between the U.S. and Canadian chocolate markets for purposes of the Rule 12(b)(6) motions. The jurisdictional challenges, in contrast, require plaintiffs to rebut the Rule 12(b)(2) defendants' affidavits with evidence reflecting in-forum contacts. In the absence of such evidence, the court must espouse the facts described in defendants' evidentiary submissions. *See supra* Part II.A.

*Dayhoff, Inc. v. H.J. Heinz Co.,* 86 F.3d 1287, 1302 (3d Cir.1996); *Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.,* 516 F.Supp.2d 324, 336 (D.Del.2007). The evidence propounded by plaintiffs does not establish a prima facie showing of purposeful availment jurisdiction over the Rule 12(b)(2) defendants.

First, plaintiffs offer evidence that Mars Canada and Nestlé Canada manufactured products in Canada and then transferred them to their American counterparts, Mars Snackfood and Nestlé U.S.A. (Doc. 472, Ex. A ¶¶ 10–11; Doc. 479, Ex. B ¶¶ 11–12.) These transactions, however, do not raise an inference that Mars Canada or Nestlé Canada influenced the post-transfer pricing of the products. Their status as remote suppliers of chocolate confectionary products does not buttress the claims of alleged antitrust harm that occurred after the products left their dominion and control.[19] *See, e.g., Ware v. Ball Plastic Container Corp.,* 432 F.Supp.2d 434, 438 n. 3 (D.Del.2006) (holding that the court lacked specific jurisdic-

tion to hear a discrimination claim against the defendant, whose sole contact with the forum was the shipment of products into the state); *Patent Incentives, Inc. v. Seiko Epson Corp.,* No. Civ.A. 88–1407, 1988 WL 92460, at *5 (D.N.J. Sept. 6, 1988) (declining to exercise specific jurisdiction in a patent infringement action over a foreign manufacturer who sold its products to its U.S. subsidiary because the manufacturer's mere importation of products was unrelated to the plaintiff's claim). A plaintiff cannot hold a manufacturer liable for a price-fixing harm occurring after the product left the manufacturer's hands absent a showing that the manufacturer retained control over product pricing. Plaintiffs have made no such showing here. Based upon the record before the court, Mars Canada and Nestlé Canada's production and supply of chocolate candy into the United States bear no clear relationship to the price-fixing harms of which plaintiffs complain[20] and cannot support personal jurisdiction under purposeful availment theory.[21] *See O'Connor,* 496 F.3d at 323

**19.** Many of the cases cited by the parties as applicable to the conduct of Mars Canada and Nestlé Canada apply stream-of-commerce doctrine rather than a pure purposeful availment analysis. The present discussion addresses only purposeful availment and minimum contacts concerns. The stream-of-commerce doctrine is considered at *infra* Part II.B.1.b.

**20.** This conclusion results from the paucity of record evidence about the product transfers. The record does not outline the distribution system by which Mars Canada and Nestlé Canada move products into the U.S., nor does it explain the terms of the transactions. Such evidence is highly relevant to Mars Canada and Nestlé Canada's participation in the American chocolate candy market and could demonstrate that these entities possess more extensive contacts with the U.S. than the current record reveals. The court will therefore grant plaintiff jurisdictional discovery to explore the precise contours of these transactions. *See infra* Part II.B.3.

**21.** Plaintiffs rely upon *MM Global Services v. The Dow Chemical Co.,* 404 F.Supp.2d 425 (D.Conn.2005) for the proposition that "manufacturing chocolate products sold throughout the United States [is] undoubtedly relevant to Plaintiffs' claims." (Doc. 523 at 26; *see also* Doc. 520 at 35–36; Doc. 521 at 33.) *MM Global,* however, is inapposite. In *MM Global,* the plaintiffs produced evidence that foreign defendants purchased products worth several million dollars from U.S. suppliers via American communication facilities and distribution networks. 404 F.Supp.2d at 430–31. The defendants then fixed prices for these products in resale transactions conducted abroad and arbitrarily refused to accept orders from the plaintiffs. *Id.* at 421. The court concluded that the foreign defendants in-forum purchases "were part and parcel" of subsequent resales at anticompetitive price levels and provided appropriate grounds for purposeful availment jurisdiction. *Id.* at 435. In the present matter, by contrast, plaintiffs have produced no evidence that either Mars

(stating that specific jurisdiction requires the plaintiff's injury to be related and proportional to the defendant's in-forum activities).

Second, plaintiffs rely upon the asset purchase and trademark licensing agreements with Hershey Global. The agreements require Hershey Global to remit periodic royalty payments based on formulae provided in the agreement. (Doc. 478–6 at 9–14; Doc. 478–8 at 12–18.) They also obligate the Cadbury entities to provide technical assistance with production and promotion of Cadbury brands, permit them to inspect Hershey Global facilities and products, and require them to approve changes to the trade dress of Cadbury-branded goods. (See·Doc. 478–5 at 19–20, 25; Doc. 478–6 at 1–5; Doc. 478–8 at 4–5, 9–12.) The agreements do not allow Cadbury plc or Cadbury Holdings to influence prices for the licensed products, to consult with Hershey Global about price structures, to inspect the protocols that Hershey Global uses to establish prices, or to obtain or disclose any pricing information whatsoever. The agreements do not suggest that pricing information actually passes between Hershey Global and the Cadbury entities, nor does the record evidence support such an inference. To the contrary, the agreements essentially reflect the disengagement of Cadbury

entities from the American chocolate confectionary market. Exercise of specific jurisdiction based upon mere consultation clauses would be disproportionate to the in-forum activities and benefits contemplated by the agreements. *O'Connor*, 496 F.3d at 323.

Finally, plaintiffs have produced no evidence connecting Nestlé S.A. to the alleged price-fixing harms in the United States. Plaintiffs broadly aver that Nestlé S.A. made chocolate candy "available for purchase" to U.S. consumers, maintained "tightly interwoven" operations between the United States and Canada, and "participated in a conspiracy to fix prices in the United States." (Doc. 520 at 34.) These conclusory allegations are insufficient to establish personal jurisdiction over Nestlé S.A. *See, e.g., Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 107 F.3d 1026, 1042 (3d Cir.1997) (refusing to allow jurisdictional discovery because plaintiffs averments that defendant "transact[ed] business" in the relevant forum were insufficient to ascribe actual forum contacts to the defendants); *Patterson*, 893 F.2d at 604.

At oral argument, plaintiffs advocated for jurisdiction over Nestlé S.A. based upon a license agreement under which Hershey Global manufactures and distrib-

---

Canada or Nestlé Canada participated in the anticompetitive sales underlying their claims. Rather, the record suggests that these defendants are remote suppliers who possess no U.S. pricing authority, and their absence from the allegedly suspect American pricing scheme places them beyond *MM Global's* reach.

*Emerson Electric Co. v. Le Carbone Lorraine, S.A.*, No. Civ.A. 05–6042, 2008 WL 4126602 (D.N.J. Aug. 27, 2008) is likewise unavailing to plaintiffs. In *Emerson Electric*, a foreign defendant moved to dismiss for lack of personal jurisdiction. The court denied the motion because the defendant allegedly exerted pricing control in the American market by

dictating prices to its American subsidiaries and by acquiring an American corporation to eliminate market competition. *Id.* at *3–4. In the instant matters, plaintiffs allege no such conduct on the part of Mars Canada or Nestlé Canada. A similar distinction exists with regard to *In re Isostatic Graphite Antitrust Litig.*, No. 00–CV–1857, 2002 WL 31421920, at *3 (E.D.Pa. Sept. 19, 2002) (concluding that exercise of personal jurisdiction over foreign defendants was proper because "[p]laintiffs have presented evidence which suggests that the allegedly anticompetitive actions of the American subsidiaries were directed, at least in part, by their foreign parent corporations").

utes Kit–Kat ® and Rolo ® in the United States using Nestlé trademarks. (Doc. 571 at 111.) However, Nestlé S.A. has proffered evidence that it is not party to this agreement. (Doc. 479, Ex. A ¶ 11.) Based upon Hershey Global's filings with the Securities and Exchange Commission, it appears that an entity known as Société des Produits Nestlé S.A. ("Société") owns the trademarks subject to the agreement. *See* Hershey Foods Corp., Annual Report (Form 10–K), at 11 (April 15, 1991) (reflecting that Hershey Global previously maintained the license agreement with Rowntree Mackintosh Confectionery Limited, which transferred it to Société on January 1, 1990); *see also* The Hershey Co., Annual Report (Form 10–K), at 108 (February 20, 2009) (same), *available at* http://idea.sec.gov/Archives /edgar/data/47111/000119312509033670/ d10k.htm (last visited Mar. 3, 2009). Société is not a party to the above-captioned matters, and the record does not describe the relationship, if any, between Nestlé S.A. and Société. At present, the record is devoid of evidence that Nestlé S.A. receives any financial benefit from the agreement. The limited information about the agreement therefore prevents it from serving as a basis for personal jurisdiction over Nestlé S.A.

Plaintiffs have failed to "establish [ ] jurisdictional facts through sworn affidavits or other competent evidence" with respect to any of the Rule 12(b)(2) defendants. *Patterson*, 893 F.2d at 604; *Poole v. Sasson*, 122 F.Supp.2d 556, 557 (E.D.Pa. 2000) ("Although all allegations in the complaint are taken as true, a plaintiff may not solely rely on bare pleadings to satisfy his jurisdictional burden."). The court concludes that the current record does not establish a prima facie showing of personal jurisdiction under purposeful availment theory.

**b.** ***Stream–of–Commerce Theory***

Plaintiffs invoke the stream-of-commerce theory against only Mars Canada. The theory, recognized by the Supreme Court in *Asahi Metal Industry Co. v. Superior Court,* generally allows a court to exercise personal jurisdiction over a defendant that directs its products into a forum. Application of *Asahi,* a plurality decision, is somewhat complicated in that it contains multiple perspectives on the theory.[22] Under the first perspective, articulated by Justice O'Connor, a defendant's isolated act of placing a product into the stream of commerce does not subject the defendant to personal jurisdiction. *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026. Rather, the defendant must engage in additional conduct that evidences a desire to participate in a market within the forum. *Id.* Examples of such conduct include designing a product for particular consumers, establishing a customer support network, retaining a sales agent, and marketing the product in the forum. *Id.* The second perspective from *Asahi,* presented by Justice Brennan, espouses a broader jurisdictional scope. Under this perspective, jurisdiction arises from the "regular and anticipated flow of products from manufacture to distribution to retail sale" regardless of whether the defendant otherwise directs activity at the forum. *Id.* at 117, 107 S.Ct. 1026. The critical inquiry is whether the defendant possesses knowledge that the product will enter a particular forum, making litigation a foreseeable result of commerce. *Id.* Justice Stevens, discussing a third perspective, eschewed a direct correlation between defendant's awareness of a product's desti-

---

**22.** *Asahi* was decided by a vote of 4–4–1. The perspectives articulated by Justices O'Connor and Brennan represent the two pluralities. Justice Stevens joined neither plurality and posited a third jurisdictional analysis.

nation and purposeful availment of the forum's laws. *Id.* at 122, 107 S.Ct. 1026 (Stevens, J., concurring). Instead, a court's exercise of jurisdiction depends upon "the volume, the value, and the hazardous character of the components" that defendant places into the stream of commerce. *Id.*

The United States Court of Appeals for the Third Circuit has embraced an amalgamation of these perspectives, resulting in a holistic stream-of-commerce analysis adapted to the facts of each particular case. *Renner v. Lanard Toys Ltd.,* 33 F.3d 277, 282–83 (3d Cir.1994). As a specific jurisdiction doctrine, however, the stream-of-commerce theory requires that plaintiff's claim arise out of the flow of defendant's products into the forum. *See Pennzoil Prods. Co. v. Colelli & Assocs.,* 149 F.3d 197, 201 (3d Cir.1998) (stating that specific jurisdiction requires a link between the defendant's activity directed in the forum and the plaintiff's harm); *Simeone ex rel. Estate of Albert Francis Simeone, Jr. v. Bombardier–Rotax GmbH,* 360 F.Supp.2d 665, 672 (E.D.Pa.2005) (declining to exercise jurisdiction under stream-of-commerce principles because no connection existed between the activities that the defendant directed toward the forum and the harm for which the plaintiff brought suit); *see also Ruiz de Molina v. Merritt & Furman Ins. Agency,* 207 F.3d 1351, 1357 (11th Cir.2000) ("The stream of commerce test for jurisdiction is met if the nonresident's product is purchased by or delivered to a consumer in the forum state, so long as the nonresidents's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there *for claims arising out of that conduct.*" (emphasis added)); *Mason v. Mooney Aircraft Corp.,* No. 02–3323–CV–S, 2003 WL 21244160, at *8 (W.D.Mo. May 8, 2003) ("The basic theory

of the stream of commerce analysis is one of foreseeability: One who puts a product into the stream of commerce in such a fashion as to reasonably foresee its sale in a certain jurisdiction cannot complain of having to defend against claims in that jurisdiction arising out of the product's presence there."). Stream-of-commerce jurisdiction must also "comport[ ] with notions of fair play and substantial justice." *Pennzoil,* 149 F.3d at 205 ("[E]ven if a defendant has the requisite minimum contacts with the forum ..., other factors may militate against exercising jurisdiction.").

Originally developed in the products liability context, courts have extended the stream-of-commerce doctrine to a variety of cases in which plaintiff's claims are directly related to particular characteristics of defendant's product or to defendants' act of shipping the product into the forum. For example, courts have invoked the theory in patent infringement cases. *See, e.g., Horne v. Adolph Coors Co.,* 684 F.2d 255, 259–60 (3d Cir.1982) (applying the stream-of-commerce theory to a patent case because the defendant could anticipate plaintiff's claim, which related to an allegedly infringing product design); *Electro Med. Equip. Ltd. v. Hamilton Med. AG,* No. Civ.A. 99–579, 1999 WL 1073636, at *6 (E.D.Pa. Nov. 16, 1999) (same). This court has applied stream-of-commerce theory to Lanham Act claims relating to false product labeling, *Hershey Pasta Group v. Vitelli–Elvea Co.,* 921 F.Supp. 1344, 1348–50 (M.D.Pa. 1996), and our sister court for the District of New Jersey has concluded that customizing a product for an in-forum purchaser provides stream-of-commerce jurisdiction over a breach-of-contract claim for alleged product defects, *Synergy, Inc. v. Manama Textile Mills, W.L.L.,* No. Civ.A. 06–4129, 2008 U.S. Dist. LEXIS 12791, at *31–42 (D.N.J.

Feb. 20, 2008). However, plaintiffs have not cited and the court has not identified any antitrust case imposing jurisdiction upon a defendant that simply shipped products into a forum and lacked control over in-forum pricing. At least two courts have refused to apply the stream-of-commerce theory in this context. *See, e.g., Four B Corp. v. Ueno Fine Chems. Indus.*, 241 F.Supp.2d 1258, 1265–66 (D.Kan.2003) (declining to apply stream-of-commerce theory in a price-fixing case because the defendant's mere insertion of products into channels of commerce was insufficient to create a relationship between the defendant and the in-forum price fixing); *Dee–K Enters. v. Heveafil Sdn. Bhd.*, 982 F.Supp. 1138, 1146–47 (E.D.Va.1997) (refusing to exercise stream-of-commerce jurisdiction over a defendant who shipped products into and attended periodic meetings in the U.S. but possessed no domestic pricing authority).

Based upon the present record, Mars Canada is beyond the court's stream-of-commerce jurisdiction because plaintiffs' claims lack a nexus with its placement of goods into conduits of commerce. Mars Canada's status as a fountainhead of chocolate products cannot support specific jurisdiction for purposes of a harm unrelated to its manufacture of goods. Defendants have presented sworn statements that Mars Canada neither sells chocolate confectionary products to U.S. consumers nor possesses pricing power in the American market. Plaintiffs have not confuted these assertions. The present record therefore does not establish a prima facie case of stream-of-commerce jurisdiction over Mars Canada.[23]

### c. Effects Test of Calder v. Jones

A plaintiff may predicate specific jurisdiction upon a defendant's activities outside of the relevant forum if the plaintiff suffered the effects of the conduct within the forum. *See Calder*, 465 U.S. at 789–90, 104 S.Ct. 1482; *Imo Indus. v. Kiekert AG*, 155 F.3d 254, 265–66 (3d Cir. 1998). Often denominated the *"Calder* effects test" after the Supreme Court decision from which it derives, this form of specific jurisdiction requires the plaintiff to establish:

(1) The defendant committed an intentional tort;

(2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of the tort; [and]

(3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

*Marten*, 499 F.3d at 297 (quoting *Imo Indus.*, 155 F.3d at 265–66). To satisfy the final element of the test, plaintiff must (a) demonstrate that "the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum" and (b) "point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum." *Id.* at 298 (quoting *Imo Indus.*, 155 F.3d at 265). A plaintiff may rely upon the *Calder* effects test to acquire jurisdiction over a defendant in cases involving business torts, including price fixing. *In re Bulk [Extruded] Graphite Prods.*, No. Civ. 02–6030, 2007 WL 2212713, at *6 (D.N.J. July 30, 2007); *see also Imo Indus.*, 155 F.3d at 265–66 (establishing a framework for ap-

**23.** Plaintiffs apparently do not assert stream-of-commerce jurisdiction over Nestlé Canada. Even if the court were to infer such an argu-
ment, the *ratio decidendi* set forth above applies with equal force to Nestlé Canada.

plication of the *Calder* test to business torts).

 In the matter *sub judice*, plaintiffs contend that the *Calder* effects test confers personal jurisdiction over Mars Canada. Plaintiffs assert that Mars Canada committed an intentional antitrust tort with domestic effects. However, plaintiffs have not raised a prima facie evidentiary showing that the company directed its conduct at the United States. None of plaintiffs' evidence suggests that Mars Canada engaged in discussions—either domestic or foreign—regarding prices of American confectionary products.[24] Based upon the current evidentiary record, the inter-company shipment of products constitutes the only activity of Mars Canada that crosses the border. Standing alone, these shipments do not establish a basis for personal jurisdiction under the *Calder* effects test.[25]

## 2. *General Jurisdiction*

 General jurisdiction arises when the defendant possesses "continuous and systematic contacts with the forum."

*Mellon Bank v. DiVeronica Bros., Inc.,* 983 F.2d 551, 554 (3d Cir.1993) (internal quotation omitted). It empowers a court to hear any claim against a defendant regardless of the claim's relationship to the defendants' in-forum contacts. *Kehm Oil Co. v. Texaco,* 537 F.3d 290, 300 (3d Cir. 2008); *Pinker,* 292 F.3d at 368 n. 1 ("If general jurisdiction exists, the contacts between the defendant and the forum need not be specifically related to the underlying cause of action in order for an exercise of personal jurisdiction over the defendant to be proper."). A court may acquire general jurisdiction over a defendant under two alternative theories. First, a court may obtain jurisdiction over any defendant that exhibits systematic and continuous contacts with the forum. Second, a court, already imbued with general jurisdiction over a corporation, may obtain jurisdiction over an affiliated entity when the two companies have fully integrated their operations and function as a single, unified entity. The latter doctrine is frequently identified as alter ego jurisdiction.

**24.** *In re Bulk [Extruded] Graphite Products* illustrates the evidentiary showing that a plaintiff must proffer to acquire jurisdiction under the *Calder* effects test. In *Bulk [Extruded] Graphite,* a foreign defendant moved to dismiss for lack of personal jurisdiction. Plaintiffs introduced deposition testimony confirming that the moving defendant had attended meetings concerning price fixing in foreign graphite markets. *Bulk [Extruded] Graphite,* 2007 WL 2212713 at *6. During these meetings, a co-conspirator recommended that the defendant "establish contacts" with the co-conspirator's American company in order to exert upward pressure on U.S. prices. *Id.* at *7–8. In furtherance of this recommendation, the defendant informed the co-conspirator that he desired to implement a global price-fixing scheme to prevent arbitrage across markets. *Id.* at *8–9. The court concluded that although the co-conspirator "did not expressly state [that the defendant] acted to fix prices in the United States, [the co-conspirator] clearly did state that a

conspiracy to fix prices in Europe must necessarily involve the fixing of prices in other markets, including the United States." *Id.* at *9. Plaintiffs therefore marshaled "thin" evidence that the defendant "expressly directed acts in furtherance of price fixing in the United States." *Id.*

In the instant matter, plaintiffs' evidentiary proffer is more diaphanous than that provided in *Bulk [Extruded] Graphite.* Plaintiffs have not submitted evidentiary support for their contentions that the American and Canadian confectionary markets are interwoven or that arbitrage opportunities exist across international boundaries. Absent an evidentiary showing consistent with that advanced in *Bulk [Extruded] Graphite,* plaintiffs have failed to establish a prima facie case of *Calder* effects jurisdiction.

**25.** Plaintiffs' briefs do not address *Calder*'s applicability to Cadbury plc, Cadbury Holdings, or Nestlé Canada.

### a. *Systematic and Continuous Contacts*

A defendant must possess "significantly more than mere minimum contacts" to support exercise of general jurisdiction; rather, the defendant's contacts with the forum must be systematic and continuous.[26] *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir.1987). The court must evaluate the "nature and quality" of a defendant's contacts in light of factors such as whether the defendant sells products, maintains a sales staff, derives significant revenue from, or advertises in the forum. *Clark v. Matsushita Elec. Indus. Co.*, 811 F.Supp. 1061, 1067 (M.D.Pa.1993) (quoting *Allied Leather Corp. v. Altama Delta Corp.*, 785 F.Supp. 494, 497–98 (M.D.Pa. 1992)); *accord BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 262 (3d Cir.2000). Other activities favoring general jurisdiction include holding a business license, filing tax returns or administrative reports, owning land or personal property, purchasing products, or employing an agent in the forum. *See ClubCom,* *Inc. v. Captive Media, Inc.*, No. 02:07–cv–1462, 2009 WL 249446, at *16 (W.D.Pa. Jan. 31, 2009); *Farina v. Nokia*, 578 F.Supp.2d 740, 750 (E.D.Pa.2008).

In the instant matter, plaintiffs predicate general jurisdiction over Nestlé S.A. upon the issuance of American Depository Receipts ("ADRs"),[27] ownership of U.S. patents, maintenance of a global website, participation in U.S. merger transactions, submission to the jurisdiction of U.S. courts, control over U.S. subsidiaries, and execution of the Société—Hershey license agreement. None of these contacts alone confers general jurisdiction over Nestlé S.A. *See BP Chems.*, 229 F.3d at 261, 263 (concluding that execution of a contract with a forum resident is alone insufficient to subject defendant to the court's jurisdiction); *Allen v. Russian Fed'n*, 522 F.Supp.2d 167, 195 (D.D.C.2007) (concluding that the issuance of ADRs does not support general jurisdiction without additional in-forum contacts);[28] *Telcordia Techs. v. Alcatel S.A.*, No. Civ.A. 04–874, 2005 WL 1268061, at *4 (D.Del.2005) ("[O]wnership of a United States patent,

---

**26.** At oral argument, counsel sparred over the variety of adjectives used to describe the type of contacts that are prerequisite to an exercise of general jurisdiction, including *systematic, continuous, substantial, significant, extensive,* and *pervasive.* (Doc. 571 at 75–76, 91.) To allay lexical concerns, the court will confine its discussion to the analysis of *systematic* and *continuous* contacts upon which the Supreme Court predicated general jurisdiction in *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 445, 72 S.Ct. 413, 96 L.Ed. 485 (1952). The court notes that *Helicopteros* later reaffirmed "continuous and systematic" contacts as the standard for exercise of general jurisdiction. 466 U.S. at 414–15 & n. 9, 104 S.Ct. 1868 (quoting *Perkins*, 342 U.S. at 438, 445, 72 S.Ct. 413).

**27.** ADRs are investment devices that allow American investors to trade shares of foreign corporations in the same manner as those of domestic companies. ADRs are issued by in-termediary banks that acquire securities from foreign corporations and repackage them as instruments that investors can freely trade on U.S. exchanges. *See Pinker*, 292 F.3d at 367.

**28.** Rejection of ADRs as the foundation for general jurisdiction is consistent with *Pinker*, which held only that ADRs, standing alone, may provide a basis for *specific* jurisdiction in a securities fraud case. *See Pinker*, 292 F.3d at 372–73. The *Pinker* court declined to address the relationship between ADRs and general jurisdiction, *id.* at 368 n. 1. To be clear, the court considers Nestlé S.A.'s ADRs relevant to the general jurisdiction analysis but not sufficient in isolation to bring Nestlé S.A. before the court. *See Allen*, 522 F.Supp.2d at 195; *accord Newport Components, Inc. v. NEC Home Elecs. (U.S.A.), Inc.*, 671 F.Supp. 1525, 1540 (C.D.Cal.1987) (relying upon ADRs as one of several contacts supporting general jurisdiction in a case decided prior to *Pinker* ).

without more, cannot support the assertion of personal jurisdiction over a foreign patentee in any state besides the District of Columbia." (citation omitted)).[29, 30]

On the present record, these activities when aggregated are also insufficient to confer general jurisdiction over Nestlé S.A. The listing of ADRs, prosecution of patents, and investigation of corporate acquisitions do not implicate systematic, continuous business dealings in the United States. Nestlé S.A. is not a party to the Société—Hershey license agreement, and its website passively provides general in-

---

29. Plaintiffs have cited no case in which a court invoked general jurisdiction over a holding company as the result of acquisitions or "due diligence" activity undertaken in the relevant forum, and the court will not announce such a rule in this case. *See, e.g., Helicopteros*, 466 U.S. at 418, 104 S.Ct. 1868 ("[M]ere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions."); *BP Chems.*, 229 F.3d at 261, 263 ("[A] nonresident's contracting with a forum resident, without more, is insufficient to establish the requisite minimum contacts" for specific or general jurisdiction.). A holding company's acquisition of a domestic entity may confer specific jurisdiction in actions related to the transaction, but they do not support general jurisdiction in the absence of additional contacts with the forum. *See, e.g., Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 438, 445, 72 S.Ct. 413, 96 L.Ed. 485 (1952) (documenting activities sufficient to support exercise of general jurisdiction, such as maintaining files, conducting business correspondence, distributing checks, opening bank accounts, and implementing management decisions within the forum); *cf. Telcordia Techs.*, 2005 WL 1268061, at *7 ("[I]ncorporating a subsidiary in the United States does not give rise to jurisdiction unless the litigation is related to the act of incorporation ...."); *compare Ross v. Altria Group, Inc.*, No. C 04–01453, 2004 WL 2055712, at *4 (N.D.Cal.2004) (declining to exercise general jurisdiction over a holding company that engaged in national advertising campaigns but conducted no operations in the forum and maintained no physical presence there); *with Shepherd Inv. Int'l v. Verizon Commc'ns Inc.*, 373 F.Supp.2d 853, 864–67 (E.D.Wis.2005) (subjecting a holding company to general jurisdiction based upon its solicitation of in-forum capital, direct mailings to shareholders, promotional activities, interactive website for the sale of stock, and business relationships with 140 in-forum banks).

The court also rejects plaintiffs' assertion that Nestlé S.A.'s retention of counsel in the U.S. establishes general jurisdiction. Plaintiffs have identified several U.S. law firms hired by Nestlé S.A. to undertake its acquisitions. (Doc. 520, Exs. 11–15.) However, it is illogical to predicate general jurisdiction upon Nestlé S.A.'s employment of attorneys to effectuate transactions that fail *ex proprio vigore* to establish such jurisdiction. A decision to the contrary would suggest that *any* retention of counsel could give rise to general jurisdiction, including hiring attorneys for purposes of litigation. The court does not suggest that the activities of a defendant's legal representatives in a forum are irrelevant. Indeed, a defendant's propensity for litigation may result in the conference of general jurisdiction. The cases *sub judice*, however, do not present such a scenario.

30. Plaintiffs assert that general jurisdiction over Nestlé S.A. is appropriate because Nestlé S.A. has consented to submit disputes arising under a 1989 joint venture contract to the United States District Court for the District of Minnesota. (Doc. 520, Ex. 36 ¶ 5(b)). Plaintiffs have identified no precedent in which a court predicated exercise of general jurisdiction upon such a fleeting contact with a forum. The court finds that this minimal contact is entitled to little weight in the analysis of general jurisdiction. *See infra* p. 568.

*Sterling Merchandising, Inc. v. Nestlé S.A.*, No. Civ. 06–1015, slip op., 2008 WL 1767092 (D.P.R. Apr. 15, 2008) is also unavailing to plaintiffs' jurisdictional quest. In *Sterling Merchandising*, Nestlé S.A. mounted a jurisdictional defense against the plaintiff's claim that it monopolized the Puerto Rican ice cream market through various corporate acquisitions. The court determined that it possessed specific jurisdiction over Nestlé S.A. and, consequently, did not address the issue of general jurisdiction. (*Id.* at 5, 15.)

formation about the Nestlé corporate family. It neither offers products for purchase nor solicits business in the United States. *In toto*, the company's actions depict little more than the predictable measures employed by a holding company to coordinate usual business among its subsidiaries.

Further, Nestlé S.A. does not engage in any of the activities to which courts have traditionally looked to find general jurisdiction. It does not buy or sell products in the United States, it has no employees in the U.S., and it does not own property, advertise, or maintain bank accounts here. As a holding company, Nestlé S.A. manufacturers no goods, it ships no products, and it maintains no sales or marketing force anywhere in the United States.

*Telcordia Technologies, Inc. v. Alcatel, S.A.* provides an apt analogy for Nestlé S.A.'s in-forum conduct. In *Telcordia,* a patent infringement case, the plaintiff attempted to obtain general jurisdiction over a foreign holding company based upon its issuance of ADRs, ownership of U.S. patents, global website and corporate image, and incorporation of an American subsidiary. 2005 WL 1268061 at *6. The court rejected these contacts—both individually and collectively—as sufficient grounds for general jurisdiction. *Id.* at *7–8. The company owned no property, consummated no business transactions, and engaged in no operations in the U.S., rendering general jurisdiction improper. *Id.* at *1, 8.

Like the foreign corporation in *Telcordia,* Nestlé S.A. possesses no contacts that result in a systematic, continuous presence in the United States. The present record fails to support general jurisdiction over Nestlé S.A.[31]

■ The remaining Rule 12(b)(2) defendants are also beyond the court's general jurisdiction. Plaintiffs predicate jurisdiction over Nestlé Canada upon the products that it shipped into the United States. However, those transactions, collectively valued at approximately C\$500,-000,[32] involved specialized chocolate products and occurred on a sporadic basis. *See, e.g., Kimball v. Countrywide Merch. Servs.,* No. Civ.A. 04–3466, 2005 WL 318752, at *3 (E.D.Pa. Feb. 8, 2005) (concluding that five sporadic in-forum sales representing less than 1% of the defendant's annual sales failed to sustain general jurisdiction). Nestlé Canada has shipped no products into the U.S. since 2007. In light of these limitations, and in the absence of additional product distribution, the present record does not support the exercise of general jurisdiction over Nestlé Canada.

■ Plaintiffs seek to acquire general jurisdiction over Cadbury plc and Cadbury Holdings on substantially the same grounds advanced against Nestlé S.A. Plaintiffs claim that the periodic business

---

**31.** *In re Automotive Refinishing Paint Antitrust Litigation,* No. 1426, 2002 WL 31261330 (E.D.Pa. July 31, 2002) and *Newport Components,* 671 F.Supp. 1525, cited by plaintiffs, do not dictate a contrary result. In both cases, the court concluded that plaintiffs had established a prima facie case of jurisdiction based upon systematic contacts with the United States, including extensive activity in furtherance of direct sales. *See Auto. Refinishing Paint,* 2002 WL 31261330, at *9 (allowing plaintiffs to engage in jurisdictional discovery after establishing that the foreign defendant moving for dismissal had directly sold prod-

ucts worth \$1.5 billion to its U.S. subsidiary); *Newport Components,* 671 F.Supp. at 1538–1540 (predicating general jurisdiction upon defendant's use of federal courts to assert legal claims, issuance of ADRs, in-forum advertising, and domestic television sales). As Nestlé S.A. does not sell products, maintain personnel, or advertise in the U.S., these cases are factually dissimilar.

**32.** The value of these exports is calculated in Canadian dollars.

inspections, quality auditing procedures, and royalty payments required by the Cadbury—Hershey agreements permit the court to exercise general jurisdiction. However, these regular but infrequent business dealings are precisely the type of contacts that the Supreme Court rejected as a basis for general jurisdiction in *Helicopteros.* 466 U.S. at 417–18, 104 S.Ct. 1868 (holding that business visits and purchases within a forum, "even if occurring at regular intervals, are not enough" to support general jurisdiction over a defendant). Hence, the court finds this argument unavailing.

 Finally, plaintiffs contend that the court may impose jurisdiction upon Mars Canada based upon bills of lading that document shipments of Mars Canada products through American ports and upon the inter-company transfer of Mars Canada products to Mars Snackfood. These bills of lading identify thirty-one different product shipments between February 26, 2007 and October 31, 2008.[33] Importantly, the shipments occurred over a twenty-month period. Without additional evidence describing the nature and scope of these shipments, the court is unable to conclude that they qualify as systematic, continuous contacts with the United States sufficient to subject Mars Canada to general jurisdiction. *See, e.g., Aaron Ferer & Sons Co. v. Am. Compressed Steel Co.,* 564 F.2d 1206, 1209 (8th Cir.1977) (concluding that two bills of lading documenting shipments into a forum were insufficient to confer jurisdiction over defendant); *NII Brokerage, LLC v. Roadway Express, Inc.,* No. 07–5125, 2008 WL 2810160, at *5–6 (D.N.J. July 18, 2008) (same with respect to an unspecified number of bills of lading); *cf. Asarco, Inc. v. Glenara, Ltd.,* 912 F.2d 784, 787 (5th Cir.1990) (declining to exercise general jurisdiction on the basis of forty-

seven ports-of-call made by defendant's ships over a four-year period); *Conner v. Bouchard Transp. Co.,* No. 93–450, 1993 WL 388274, at *3 (E.D.Pa. Sept. 30, 1993) (refusing to exercise general jurisdiction over a defendant that owned thirty-six vessels that made one hundred ports-of-call in the forum over a five-year period). For example, the record does not indicate whether Mars Canada and Mars Snackfood perform these transfers pursuant to a contract for the sale of goods, as like-kind exchanges, or as accounting conventions for the purpose of relocating assets. Information about the frequency of the transfers, the products involved, and the resulting financial benefit, if any, to Mars Canada is also absent. At present, the record evidence is inadequate to establish that Mars Canada's in-forum activities occur on a systematic and continuous basis.

### b. *Alter Ego Jurisdiction*

 A court may exercise general jurisdiction over a foreign corporation if it possesses jurisdiction over a parent or subsidiary and the two companies operate de facto as a single, organic entity. The applicability of alter ego jurisdiction depends upon whether

(1) the parent owns all or a significant majority of the subsidiary's stock,

(2) commonality of officers or directors exists between the two corporations,

(3) the corporate family possesses a unified marketing image, including common branding of products,

(4) corporate insignias, trademarks, and logos are uniform across corporate boundaries,

(5) corporate family members share employees,

---

**33.** Plaintiffs submitted fifty-nine bills of lading, many of which appear to be duplicative.

(6) the parent has integrated its sales and distribution systems with those of its subsidiaries,

(7) the corporations exchange or share managerial or supervisory personnel,

(8) the subsidiary performs business functions that would ordinarily be handled by a parent corporation,

(9) the parent uses the subsidiary as a marketing division or as an exclusive distributor, and

(10) the parent exercises control or provides instruction to the subsidiary's officers and directors.

*See Simeone*, 360 F.Supp.2d at 675; *see also Directory Dividends, Inc. v. SBC Commc'ns, Inc.*, No. 01–CV–1974, 2003 WL 21961448, at *3 (E.D.Pa. July 2, 2003); *accord Genesis Bio–Pharms. v. Chiron Corp.*, 27 Fed.Appx. 94, 98 (3d Cir.2002). No single factor is dispositive, and the court may consider all relevant evidence to determine whether the parent exercises actual control over a subsidiary beyond that which is characteristic of a usual parent-subsidiary relationship. *Directory Dividends*, 2003 WL 21961448, at *3 ("The Court 'should examine *all relevant factors*

that relate to the intimacy of the relationship between the parent and the subsidiary ....'" (quoting *Arch v. Am. Tobacco Co.*, 984 F.Supp. 830, 837 (E.D.Pa.1997) (emphasis added))); *see also Action Mfg. Co. v. Simon Wrecking Co.*, 375 F.Supp.2d 411, 421 n. 13 (E.D.Pa.2005) (observing that alter ego factors developed in the corporate veil-piercing context, such as gross undercapitalization and extensive parental control, are also relevant to the jurisdictional analysis).[34] A plaintiff may invoke alter ego jurisdiction against "nonresident corporations upon a finding that *either* the 'dominant' or 'subservient' corporation does business" within the forum. *Directory Dividends*, 2003 WL 21961448, at *3 (emphasis added) (quoting *Aamco Automatic Transmissions, Inc. v. Tayloe*, 368 F.Supp. 1283, 1300 (E.D.Pa.1973)).

 Plaintiffs contend that the court may exercise alter ego jurisdiction over the Rule 12(b)(2) defendants because their respective corporate families operate as integrated conglomerates with a single identity. Defendants' corporate parents own all of the outstanding stock of the subsidiaries, and each corporate family has cultivated a unified global image. Defendants websites,[35] annual reports, and cor-

---

**34.** Courts evaluate alter egos in the veil-piercing context by reference to factors such as undercapitalization of the subsidiary, "failure to observe corporate formalities, nonpayment of dividends, insolvency of [the] debtor corporation, siphoning of funds from the debtor corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a facade for the operations of the dominant stockholder." *Action Mfg.*, 375 F.Supp.2d at 421–22; *see also Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484–85 (3d Cir.2001). These factors also affect the alter ego jurisdictional analysis but do not preclude consideration of other indicia of corporate control. *Action Mfg.*, 375 F.Supp.2d at 421 n. 13 (observing that "the factors considered in deciding whether to pierce the corporate veil for liability purposes

are similar to the factors considered in deciding whether to pierce the corporate veil in the jurisdictional context" but that a court should address "all relevant factors" when resolving questions of jurisdiction); *Arch*, 984 F.Supp. at 837 ("[The court] should examine all relevant factors that relate to the intimacy of the relationship between the parent and subsidiary.").

**35.** Plaintiffs rely upon defendants' websites as a component of their jurisdictional arguments. A website may support exercise of jurisdiction if the defendant "intentionally interacts with the forum ... via the web site." *Toys "R" Us*, 318 F.3d at 452. Websites that passively furnish information do not confer jurisdiction over the defendant, whereas sites that allow users to purchase goods or services generally provide a jurisdictional an-

porate policy statements confirm that each corporate family operates in multinational markets, promulgates international standards for product quality and employee conduct, and implements global marketing and sales strategies. In addition, Mars Canada and Nestlé Canada participate in intra-family product distribution, and one Mars Global employee sits on Mars Canada's board of directors. (Doc. 472, Ex. A ¶¶ 10–11, 19; Doc. 479, Ex. B ¶¶ 11–12.)

 This evidence does not construct a prima facie case of alter ego jurisdiction under the *Simeone* factors because it fails to demonstrate the corporate parents' actual control over the daily affairs of their subsidiaries. *See, e.g., Toys "R" Us*, 318 F.3d at 452 (stating that passive websites that provide information but do not solicit business will not confer general jurisdiction over an out-of-forum defendant); *Action Mfg.*, 375 F.Supp.2d at 423 (concluding that alter ego jurisdiction does not arise merely because a parent corporation refers to its subsidiaries as corporate divisions). It is unclear whether defendants' subsidiaries develop market-specific plans for growth and product development independent of their parent corporations. The record does not reflect whether supervisory personnel flow freely among members of the corporate families, whether or the extent to which parent corporations control subsidiaries' budgets, or whether parent corporations oversee essential components of subsidiaries' businesses.[36] Alter ego jurisdiction requires evidence of such control. *Simeone*, 360 F.Supp.2d at 676–77 (applying alter ego jurisdiction to a case in which the parent corporation supervised the subsidiary's management, possessed the power to fire the subsidiary's managers, controlled the subsidiary's budget, participated in decisions pertaining to the subsidiary's corporate structure, and regularly evaluated the subsidiary's operations against performance benchmarks), *Directory Dividends*, 2003 WL 21941448, at *4–6 (exercising alter ego jurisdiction over a parent of a corporate family that possessed a unified identity, featured numerous overlapping directorates, allowed free exchange of supervisory personnel, and in

chor. *Id.* A defendant's "conscious choice to conduct business with residents of a forum state" via its website is pivotal to this inquiry. *Id.* (quoting *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119, 1126 (W.D.Pa. 1997)). The Rule 12(b)(2) defendants maintain centralized corporate websites that provide basic information about defendants' history, brands, and market development. They inform visitors of the current price of defendants' stock and ADRs, provide links to annual reports and press releases, and allow prospective employees both in the U.S. and abroad to search open positions and submit online applications. None of the websites offers products for sale. None of the websites allows visitors to purchase stock or ADRs online. Although the websites contain information about defendants' activities within the U.S., they are not customized for an American audience, and they treat the U.S. market no differently than other global markets. The court concludes that these websites are properly considered as a contact for purposes of general jurisdiction. However, the court also concludes that they are broad resources designed for an international audience. They do not reflect a particularized intent to conduct business with American residents and therefore receive relatively little weight in the jurisdictional analysis.

36. Plaintiffs advance alter ego jurisdiction over Cadbury plc and Cadbury Holdings by virtue of alleged control over their American subsidiary, Cadbury Adams USA LLC, which is not a party to this matter. (Doc. 571 at 21–23.) Plaintiffs have identified no case law addressing whether a court may obtain alter ego jurisdiction over a holding company by virtue of its relationship with a non-party subsidiary. The court will defer consideration of this issue until completion of jurisdictional discovery. If plaintiffs wish to pursue this argument, counsel will be expected to address it in supplemental briefing.

which the parents' officers established corporate policy for all family members).[37] Defendants cannot be subject to alter ego jurisdiction without additional evidence that they have beclouded corporate boundaries and that two or more affiliated entities are de facto one. At this juncture, plaintiffs have not established a prima facie case of personal jurisdiction against the Rule 12(b)(2) defendants.

### 3. *Jurisdictional Discovery*

A plaintiff who fails to establish a prima facie case of personal jurisdiction may request a period of limited discovery for the purpose of obtaining further jurisdictional evidence. "[C]ourts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is 'clearly frivolous.'" *Toys "R" Us*, 318 F.3d at 456 (quoting *Mass. Sch. of Law*, 107 F.3d at 1042). Plaintiffs must identify particular facts that demonstrate the likelihood of contacts sufficient to corral defendants within the court's jurisdiction. *Id.* General allegations that defendants transact business within the forum do not entitle plaintiffs to jurisdictional discovery; plaintiffs must produce evidence suggesting that discovery will bear fruit. *Brown*

*v. AST Sports Sci., Inc.*, No. Civ.A. 02–1682, 2002 WL 32345935, at *10 (E.D.Pa. June 28, 2002) (citations omitted); *see also Base Metal Trading Ltd. v. OJSC "Novokuznetsky Aluminum Factory"*, 47 Fed. Appx. 73, 77 (3d Cir.2002) (observing that jurisdictional discovery is inappropriate if it constitutes a "fishing expedition" to procure evidence in support of the plaintiff's claim). A court weighing a jurisdictional discovery request must "accept the plaintiff's allegations as true, and ... construe disputed facts in favor of plaintiff." *Toys "R" Us*, 318 F.3d at 457. The court should generally permit jurisdictional discovery prior to dismissing a defendant for lack of personal jurisdiction. *See In re Auto. Refinishing Paint Antitrust Litig.*, No. 1426, 2002 WL 31261330, at *5 (E.D.Pa. July 31, 2002); *Molnlycke Health Care AB v. Dumex Med. Surgical Prods.*, 64 F.Supp.2d 448, 454 (E.D.Pa.1999).

In the instant matter, plaintiffs have adduced sufficient evidence to warrant jurisdictional discovery against the Rule 12(b)(2) defendants. Mars Canada and Nestlé Canada interacted with the American chocolate candy market by im-

---

**37.** Alter ego jurisdiction does not attach merely because a parent corporation participates in its subsidiary's business. In *Savin Corp. v. Heritage Copy Products, Inc.*, a parent corporation appointed six of the subsidiary's directors, five of which were officers or directors of the parent. 661 F.Supp. 463, 469 (M.D.Pa.1987). One of the parent's officers conducted weekly business visits to the subsidiary's premises to oversee the parent's investment in the subsidiary, and the parent covered a portion of the subsidiary's operating costs. *Id.* at 470. The parent also consolidated the subsidiary's earnings in its financial statements (as required by the law of the country of its incorporation) and utilized the subsidiary's office space. *Id.* at 471. Despite this extensive interaction between two corporations, the court declined to assert alter ego jurisdiction. The court observed that the two

entities engaged in different lines of business, maintained separate corporate books, did not implement common marketing strategy, and had complied with all legal formalities. *Id.* Moreover, the plaintiff failed to "convince the court that [the parent corporation] exercised the type of control over [the subsidiary's] day-to-day operations which would evidence an alter-ego relationship." *Id.* at 470.

Plaintiffs in the instant case have identified significantly fewer interactions between Nestlé S.A., Mars Global, Cadbury Holdings, and Cadbury plc, and their respective subsidiaries. The annual reports, websites, and corporate value statements offered by plaintiffs do not describe the day-to-day operational relationship that exists among these corporations, and this evidentiary deficiency subverts plaintiffs' arguments in favor of alter ego jurisdiction.

porting products into the United States. Cadbury plc and Cadbury Holdings periodically consult with Hershey Global in the U.S. under the trademark licensing agreements. The nature of Nestlé S.A.'s relationship, if any, to the Société—Hershey trademark licensing agreements is presently unknown. Although Nestlé S.A. has engaged in merger activity, it is unclear whether and to what extent it has solicited capital, marketed securities, courted investors, or controlled acquisition subsidiaries in the United States. The present record contains faint silhouettes of these in-forum contacts but lacks a substantive portrait thereof. A period of discovery will enable plaintiffs to develop the lineaments of these relationships with the U.S. market.[38] Plaintiffs have filed a motion for preliminary discovery (Doc. 458) accompanied by several proposed requests for production of documents (Doc. 458, Ex. A). The court will allow plaintiffs to serve these requests[39] and to take limited deposition testimony,[40] after which all parties will

**38.** As a non-exclusive guide for counsel, the court suggests exploration of the following issues:

- Do representatives of Hershey Global and Cadbury plc or Cadbury Holdings regularly confer as contemplated in the asset purchase and trademark agreements? If so, what information do they discuss?
- Which party to the Cadbury—Hershey agreements prosecutes and defends trademark infringement actions under the Lanham Act?
- What benefits, if any, does Nestlé S.A. receive under the Société—Hershey trademark license agreement?
- Have the Rule 12(b)(2) defendants filed any lawsuit(s) in any court in the United States?
- Do the Rule 12(b)(2) defendants transact business in the United States, e.g., by purchasing raw materials, retaining consultants, maintaining sales agents, or recruiting employees?
- Have the Rule 12(b)(2) defendants executed service contracts with U.S. companies, e.g., for shipment of their products, design or manufacture of machinery, or development of promotional materials?
- Did the Rule 12(b)(2) defendants increase or reduce the volume of products shipped into the United States during the putative class period. If so, what were the reasons for the change?
- What form of compensation do Mars Canada and Nestlé Canada receive from the transfer of their products to Mars Snackfood and Nestlé U.S.A.? Are the transfers booked as direct sales or in some other fashion?
- Does Nestlé S.A. market securities, solicit capital, or entice investors in the United States in furtherance of its merger activity?
- Does Mars Canada possess autonomy to determine to whom it sells its products, i.e., does Mars Canada sell its products to non-Mars entities?
- Do Mars Canada and Nestlé Canada exercise independent control over their marketing, sales, and distribution systems, or are they required to utilize systems that interconnect with other members of their corporate families?

The court emphasizes that these issues are only illustrative of those to which the court will turn when resolving the jurisdictional challenges. Plaintiffs may pursue additional areas of inquiry insofar as it elucidates the Rule 12(b)(2) defendants' contacts with the United States.

**39.** *As currently worded*, several of plaintiffs' requests exceed the scope of the jurisdictional issues implicated by the Rule 12(b)(2) motions. For example, Request No. 4 (pertaining to corporate officers' responsibilities), Request No. 7 (pertaining to sales data), Request No. 8 (pertaining to pricing letters and announcements), and Request No. 11 (pertaining to per-unit manufacturing and distribution costs) likely solicit information beyond the realm of personal jurisdiction. The court expects that the parties will meet and confer to tailor all jurisdictional discovery to the issues raised in this memorandum.

**40.** The court will not impose specific limits on the aggregate number of depositions on jurisdictional issues. However, the court suggests that the parties attempt to address these issues predominantly through written discovery. Absent compelling circumstances, the

submit supplemental briefs on the personal jurisdiction motions. The court will issue a Case Management Order concurrently with this memorandum governing the parameters and deadlines for this period of jurisdictional discovery.[41]

### III. Motions to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted

All defendants have moved to dismiss the amended complaints for failure to plead an antitrust claim. The court will defer the Rule 12(b)(2) defendants' challenges to the sufficiency of the complaints until it has resolved matters of personal jurisdiction. Hence, the following discussion of the Rule 12(b)(6) motions applies only to those defendants that do not contest personal jurisdiction.[42]

### A. Standard of Review Applicable to Motions under Rule 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief can be granted. FED.R.CIV.P. 12(b)(6). When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept as true all [factual] allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." *Kanter v. Barella*, 489 F.3d 170, 177 (3d Cir.2007) (quoting *Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir.2005)). Although the court is generally limited in its review to the facts in the complaint, it "may also consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n. 2 (3d Cir.1994); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997).

Federal notice and pleading rules require the complaint to "give the defendant notice of what the ... claim is and the grounds upon which it rests." *Sershen v. Cholish*, No. 3:07–CV–1011, 2007 WL 3146357, at *4 (M.D.Pa. Oct. 26, 2007) (quoting *Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007)). The plaintiff must present facts that, if true, demonstrate a plausible right to relief. *See* FED.R.CIV.P. 8(a) (stating that the complaint should include "a short and plain statement of the claim showing that the pleader is entitled to relief"); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) (requiring plaintiffs to allege facts sufficient to "raise a right to relief above the speculative level"); *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir.2007). Thus, courts should not dismiss a complaint for failure to state a claim if it contains "enough factual matter (taken as true) to suggest the required element. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips v. County of Allegheny*, 515 F.3d

---

court suggests a limit of two depositions per defendant.

**41.** Defendant-intervenor Government of Canada initially opposed certain of these requests. (*See* Doc. 495 at 9–13.) All parties affected by the requested documents successfully negotiated a resolution of defendant-intervenor's objections and submitted a proposed order memorializing their agreement via facsimile on December 12, 2008. The court will incorporate this joint resolution into the Case Management Order that will govern jurisdictional discovery.

**42.** These defendants are Cadbury Canada, Hershey Global, Hershey Canada, Mars Global, Mars Snackfood, and Nestlé U.S.A.

224, 234 (3d Cir.2008) (quoting *Twombly,* 550 U.S. at 556, 127 S.Ct. at 1965). Under this liberal pleading standard, courts should generally grant plaintiffs leave to amend their claims before dismissing a complaint that is merely deficient. *See Grayson v. Mayview State Hosp.,* 293 F.3d 103, 108 (3d Cir.2002); *Shane v. Fauver,* 213 F.3d 113, 116–17 (3d Cir.2000).

## B. *Discussion*

Defendants move to dismiss the amended complaints for failure to plead facts raising a plausible right to relief according to the standard set forth in the recent Supreme Court decision of *Bell Atlantic Co. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In addition to the *Twombly* challenge, defendants asseverate that certain state law claims are not cognizable as a matter of substantive law. The court will address the *Twombly* defense before turning to state law issues.

### 1. *Sherman Act Claims*

■■■■ Section 1 of the Sherman Act proscribes "contract[s], combination[s] ... or conspirac[ies], in restraint of trade or commerce." 15 U.S.C. § 1. A § 1 claim requires the plaintiff to demonstrate that the defendants engaged in unlawful, concerted activity that both produced anticompetitive effects in the relevant market and resulted in harm to the plaintiff. *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 760–61, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *Petruzzi's IGA Supermarkets, Inc. v. Darling–Del. Co.,* 998 F.2d 1224, 1232 (3d Cir.1993); *In re Pressure Sensitive Labelstock Antitrust Litig. (Labelstock I* ), 356 F.Supp.2d 484, 489 (M.D.Pa.2005). The existence of an agreement is an essential component of any § 1 claim. *In re Flat Glass Antitrust Litig.,* 385 F.3d 350, 356 (3d Cir.2004). A plaintiff must establish that the defendants possessed a "conscious commitment" to a common scheme contrived for the purpose of advancing an unlawful objective such as fixing prices. *Monsanto,* 465 U.S. at 764, 104 S.Ct. 1464.

■■■■ At the pleading stage, plaintiff's complaint must aver facts creating a plausible inference that defendants entered an agreement to restrain trade. *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1965. The plaintiff must "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.*; *Phillips,* 515 F.3d at 232. Specifically, sufficiency of a complaint depends upon the particular facts alleged and the context in which they appear. The complaint must, when evaluated macroscopically, raise a plausible right to relief and notify the defendants of the ground from which it arises. *Twombly,* 550 U.S. at 553–55, 127 S.Ct. at 1964; *Phillips,* 515 F.3d at 232; *see also* FED.R.CIV.P. 8(a).

■■■■ Mere averments of parallel conduct by the defendants are inadequate to state a § 1 claim because such action may reflect either an anticompetitive agreement or independent, competitive activity. *See Twombly,* 550 U.S. at 556–58, 127 S.Ct. at 1966; *In re OSB Antitrust Litig.,* No. 06–826, 2007 WL 2253419, at *2 (E.D.Pa. Aug. 3, 2007). Rather, the plaintiff must allege a factual framework sufficient to "nudge [ ] th[e] claims across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974; *Behrend v. Comcast Corp.,* 532 F.Supp.2d 735, 741 (E.D.Pa.2007) (characterizing a *Twombly* complaint's primary deficiency as a lack of facts sufficient to raise an inference of collusive activity).

Any plaintiff may raise this inference of plausibility through allegations that contextually suggest an anticompetitive agreement. *In re Flat Glass Antitrust Litigation* delineates various market

characteristics that raise an inference of plausibility when juxtaposed with parallel conduct. *See In re Pressure Sensitive Labelstock Antitrust Litig. (Labelstock II),* 566 F.Supp.2d 363, 371 (M.D.Pa. 2008).[43] For example, a plaintiff may aver that the relevant market is ripe for collusion due to the presence of oligarchic sellers, diffuse buyers, prohibitive entry barriers, and standardized products. *See Flat Glass,* 385 F.3d at 361; *In re TFT–LCD (Flat Panel) Antitrust Litig.,* 586 F.Supp.2d 1109, 1115–16 (N.D.Cal.2008); *In re Static Random Access Memory (SRAM) Antitrust Litig.,* 580 F.Supp.2d 896, 901 (N.D.Cal.2008). Allegations that demand is in decline, that the market features high fixed costs, or that competitors possess excess capacity may also implicate an agreement when joined with averments of anticompetitive or parallel conduct. *See Flat Glass,* 385 F.3d at 361–62; *Labelstock II,* 566 F.Supp.2d at 372–73 & n. 8; *OSB,* 2007 WL 2253419, at *3–4. The court should also consider whether the alleged collusion makes economic sense. *Petruzzi's IGA Supermarkets,* 998 F.2d at 1232 (expressing skepticism of alleged conspiracies that have no economic justification from the defendant's perspec-

tive); *Labelstock I,* 356 F.Supp.2d at 493 & n. 8.

■ In the case *sub judice,* plaintiffs have alleged that defendants engaged in three coordinated price increases between 2002 and 2007. Each installment featured uniform increases in prices for defendants' standard-size chocolate bars and nearly congruent escalations for other products. The amended complaints depict a mature chocolate market featuring dispersed buyers and concentrated sellers. Strong entry barriers surround the market in the form of high fixed costs, extensive expenditures associated with launching new products, and a steep curve in the acquisition of technical expertise. During the putative class period, the costs of energy and of defendants' key raw materials remained stable as a result of placid supply markets and the strategic hedge of futures contracts. In addition, defendants purportedly faced waning demand as a result of consumer trends favoring healthier snack options. The complaints depict a prototypical market susceptible to conspiratorial price-fixing. *In re Flat Glass,* 385 F.3d at 361.

■ Defendants' alleged conduct in Canada enhances the plausibility of the alleged U.S. price-fixing conspiracy.[44]

---

43. Although *Flat Glass* was decided in a summary judgment posture; this court has previously concluded that its circumstantial analysis of anticompetitive conduct is relevant to the plausibility analysis under *Twombly. See Labelstock II,* 566 F.Supp.2d at 372–73 ("[A]llegations of observed conduct—actual forbearance from competition for customers, parallel price increases, and excess production capacity—are placed among other factual allegations that plausibly suggest a preceding agreement.").

44. The Foreign Trade Antitrust Improvement Act of 1982 ("FTAIA"), 15 U.S.C. § 6a, does not foreclose consideration of defendants' conduct in Canada for purposes of the Rule 12(b)(6) motions. The FTAIA places foreign anticompetitive conduct beyond the reach of

the Sherman Act if it "adversely affect[s] *only* foreign markets." *F. Hoffmann–La Roche Ltd. v. Empagran S.A.,* 542 U.S. 155, 161, 124 S.Ct. 2359, 159 L.Ed.2d 226 (2004) (emphasis added). It does preclude a Sherman Act claim based upon foreign conduct that has a "direct, substantial, and reasonably foreseeable effect" on domestic commerce. *Id.* at 161, 124 S.Ct. 2359 (quoting 15 U.S.C. § 6a(1)); *In re Intel Corp. Microprocessor Antitrust Litig.,* No. Civ.A. 05–1717, 2007 WL 137152, at *11 (D.Del. Jan. 12, 2007) (observing that the FTAIA does not prohibit inquiry into foreign conduct that is relevant to domestic claims.) Hence, the Act permits assessment of the Canadian conduct, which allegedly constitutes an integral component of the instant price-fixing scheme. *See Intel Corp.,*

Both the U.S. and Canadian markets are structured in a similar manner, the Canadian defendants allegedly transport chocolate candy into the U.S., and defendants have developed integrated distribution systems that service both markets.[45] The Canadian defendants exchanged numerous pricing communications and raised Canadian prices concurrently with uniform price increases in the United States. Hershey Global facilitated communications among the Canadian defendants by providing Nestlé Canada's Leonidas with contact information for Hershey Canada's Lent. The operational and structural similarities between the American and Canadian markets lend plausibility to plaintiffs' allegations of conspiratorial pricing agreements in the U.S. Moreover, defendants had ample opportunity to consult with one another about the U.S. and Canadian price increas-

es. Sherman Act notwithstanding, the alleged anticompetitive activity also makes economic sense. In a saturated, declining market, defendants faced stagnant or decreasing demand with limited capacity for market growth. Plaintiffs' contention that defendants sought to increase revenue through non-competitive means is a plausible reaction to harsh market realities. The alleged price-fixing agreement would increase profits without branding and marketing expenditures, which are essential to capturing a competitor's market share. Therefore, it represents an economically sensible course of action.

These allegations satisfy *Twombly*'s pleading standard. The motion to dismiss (Doc. 476) the Sherman Act claims under Rule 12(b)(6) will be denied with respect to defendants that have not filed a Rule 12(b)(2) motion.[46]

---

2007 WL 137152, at *11; *cf. In re Aspartame Antitrust Litig.*, No. 2:02–CV–1732, 2008 WL 2275531, at *3 (E.D.Pa. May 13, 2008) (concluding that the FTAIA does not limit discovery requests directed abroad if they are related to an antitrust matter properly before a federal court).

**45.** Of course, defendants contest the connectivity between the U.S. and Canadian chocolate confectionary markets and have produced evidence that the Canadian defendants do not interact with the U.S. *See supra* p. 559. Unlike Rule 12(b)(2) challenges, however, a Rule 12(b)(6) motion restricts the court's review to the face of the complaint and documents upon which it relies. *See supra* note 18; Part III.A. Accordingly, the court has considered only the facts contained in the amended complaints for purposes of the instant motions notwithstanding defendants evidence to the contrary.

**46.** *In re Elevator Antitrust Litigation*, 502 F.3d 47 (2d Cir.2007), does not compel a contrary conclusion. The plaintiffs in *Elevator* alleged a price-fixing conspiracy in the U.S. market for elevators based upon evidence that defendants fixed prices in European markets. *Id.* at 51–52. As to the American market, plaintiffs advanced only conclusory allegations that

defendants "(a) [p]articipated in meetings in the United States and Europe to discuss pricing and market divisions; (b) [a]greed to fix prices for elevators and services; (c) [r]igged bids for sales and maintenance; (d) [e]xchanged price quotes; (e) [a]llocated markets for sales and maintenance; (f) [c]ollusively required customers to enter long-term maintenance contracts; and (g) [c]ollectively took actions to drive independent repair companies out of business." *Id.* at 51 n. 5. (internal quotation omitted). The court upheld dismissal of the plaintiff's allegations because "[a]llegations of anticompetitive wrongdoing in Europe—*absent any evidence of linkage between such foreign conduct and conduct here*—is merely to suggest … that if it happened there, it could have happened here." *Id.* at 52 (emphasis added, internal quotation omitted). The court noted that the outcome may have differed had the plaintiffs alleged that the defendants engaged in global marketing, produced fungible products, monitored prices in other markets, or raised prices successfully in the United States. *Id.*

The instant complaints do not suffer from the same *Twombly* infirmities. They assert that defendants instituted three contemporaneous and nearly identical price increases and monitored pricing in both the United

## 2. State Law Claims

Plaintiffs representing the putative subclasses of indirect end users (hereinafter "the IEU plaintiffs") and indirect purchasers for resale (hereinafter "the IPR plaintiffs") collectively advance claims under the antitrust and consumer protection statutes of twenty-five states and the District of Columbia.[47] These plaintiffs also advance common law claims for unjust enrichment. Defendants move to dismiss certain of these claims on the grounds that plaintiffs lack standing and that plaintiffs have failed to allege facts demonstrating a plausible right to relief.[48] The court will address these claims *seriatim*.

### a. Standing to Assert Claims under the Statutes of States Where No Named Plaintiff Resides

Defendants move to dismiss the IEU and IPR plaintiffs' claims under the statutes of states in which no putative class representative either resides or does business. Defendants contend that the named plaintiffs lack Article III standing to assert state law claims when they suffered no antitrust injury within these states.[49]

---

States and Canada. They describe a market ripe for collusion, punctuated by declining demand and product saturation. They also detail significant interaction between similarly structured markets the U.S. and Canada, where authorities have identified strong evidence of price fixing. These allegations are sufficient to "nudge [plaintiffs'] claims across the line from conceivable to plausible," and render *Elevator* inapposite to defendants' motions. *Id.* at 52 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. at 1974).

47. The IEU plaintiffs advance antitrust claims under the laws of the following states: Arizona, California, the District of Columbia, Iowa, Kansas, Maine, Michigan, Minnesota, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin. (Doc. 420 ¶¶ 136–156.) They also allege claims under the following state consumer protection statutes: Arkansas, California, the District of Columbia, Florida, Kansas, Maine, Massachusetts, Nebraska, Nevada, New Mexico, New York, North Carolina, New Hampshire, Rhode Island, Vermont, and Wisconsin. (*Id.* ¶¶ 161–176.) The IPR plaintiffs maintain antitrust claims under the laws of Alabama, Arkansas, California, the District of Columbia, Florida, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, Tennessee, Vermont, West Virginia, and Wisconsin. (Doc. 422 ¶ 102.)

The IEU and IPR plaintiffs have withdrawn their claims under the antitrust statutes of Hawaii, Haw.Rev.Stat. §§ 480–1 to –24, and New York, N.Y. Gen. Bus. Law §§ 340–47. (Doc. 525 at 22 n. 24; Doc. 526 at 1 nn. 1–2.) The IEU plaintiffs have likewise withdrawn their claim under New Jersey law, N.J. Stat Ann. §§ 56:9–1 to –19, as have the IPR plaintiffs with respect to their claims under Illinois law, 740 Ill. Comp. Stat. §§ 10/1–/12. (*Id.*) The court is cognizant of defendants' request for dismissal "with prejudice," (Doc. 540 at 3), but declines to foreclose reassertion of these claims given the vast potential for changes in the litigation landscape. Hence, the court will deny the motion to dismiss (Doc. 469) these claims as moot.

48. Defendants request dismissal of the state antitrust claims on the same basis that they seek dismissal of the Sherman Act claim, which constitutes a prerequisite to liability under state law. The court's ruling with respect to *Twombly* renders this argument moot. *See supra* Part III.B.1.

49. The putative class of IPR plaintiffs currently possesses one named plaintiff that does business in Kansas. Defendants seek dismissal on standing grounds of all of the IPR plaintiffs' claims except those brought under Kansas law. The IPR plaintiffs propose to resolve defendants' objection by filing a second amended complaint that (1) describes the named plaintiff's business activities in Iowa and Nebraska and (2) adds parties from each of the other states whose law the IPR plaintiffs invoke. The court will permit the IPR plaintiffs to pursue a second amended complaint in accordance with the order accompanying this memorandum.

 A plaintiff possesses standing under Article III if the plaintiff has suffered an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations and internal quotations omitted). In the class action context, standing requires that the named plaintiff's injury be typical of the class members he or she seeks to represent. *See* FED.R.CIV.P. 23(a)(3); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 246 (D.Del.2002). "[A] plaintiff who lacks the personalized, redressable injury required for standing to assert claims on his own behalf would also lack standing to assert similar claims on behalf of a class." *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 135 (3d Cir. 2000).

Courts generally address challenges to standing as threshold matters. *Warth v. Seldin*, 422 U.S. 490, 517–18, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Pa. Prison Soc'y v. Cortes*, 508 F.3d 156, 158 (3d Cir.2007). In class actions, however, the Supreme Court has crafted an exception to this general rule: Courts may evaluate class certification issues before Article III standing concerns if the former are "logically antecedent" to the latter. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) (quoting *Amchem Prods. v. Windsor*, 521 U.S. 591, 612, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). Neither the Supreme Court nor the Third Circuit has described the precise circumstances under which class certification logically takes precedence over standing. However, our sister court for the District of New Jersey has considered it on several occasions and concluded that

> [t]he *Ortiz* exception appears "to rest on the long-standing rule that, once a class

is properly certified, statutory and Article III standing requirements must be assessed with reference to the class as a whole, not simply with reference to the individual named plaintiffs." *Payton v. County of Kane*, 308 F.3d 673, 680 (7th Cir.2002). Accordingly, Rule 23 certification should be addressed first in those cases where it is the possibility of class certification that gives rise to the jurisdictional issue as to standing. *See Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 333 n. 2 (5th Cir. 2002). Stated differently, *the Ortiz exception treating class certification as the antecedent consideration does not apply if the standing issue would exist regardless of whether the named plaintiff filed his claim alone or as part of a class. See id.*

*Clark v. McDonald's Corp.*, 213 F.R.D. 198, 204 (D.N.J.2003) (emphasis added). As interpreted by *Clark*, *Ortiz* allows a court to defer ruling on Article III standing issues when they are circumscribed by the act of certifying a class. *Id.*; *see also Sheet Metal Workers Nat'l Health Fund v. Amgen, Inc.*, No. Civ.A. 07–5295, 2008 WL 3833577, at *9 (D.N.J. Aug. 13, 2008); *In re Buspirone Patent Litig.*, 185 F.Supp.2d 363, 377 (S.D.N.Y.2002).

 In the instant matter, the plaintiffs' capacity to represent individuals from other states depends upon obtaining class certification, and the standing issue would not exist but for their assertion of state law antitrust claims on behalf of class members in these states. *See In re Hypodermic Prods. Antitrust Litig.*, MDL No. 1730, 2007 WL 1959225, at *15 (D.N.J. June 29, 2007). Therefore, the standing issues arise from the plaintiffs' attempts to represent the proposed class. *Id.* These class certification issues are "logically antecedent" to the standing concerns, and the court will defer ruling on the latter

until class certification proceedings. *Ortiz*, 527 U.S. at 831, 119 S.Ct. 2295; *see also Sheet Metal*, 2008 WL 3833577, at *9; *Hypodermic Prods.*, 2007 WL 1959225, at *15; *Clark*, 213 F.R.D. at 204–05.

### b. *Claims under State Antitrust Statutes*

Defendants move to dismiss the IPR and IEU plaintiffs' claims under the statutory and common law of New York. They also request dismissal of the IPR and IEU plaintiffs' claims under the antitrust statutes of Nevada, South Dakota, Tennessee, West Virginia, and Wisconsin.[50],[51] The court will address each of the state law claims respectively.

### i. *New York*

■ Defendants move to dismiss the IPR plaintiffs' claim under New York's Donnelly Act, N.Y. GEN. BUS. LAW § 340(6), and the IEU plaintiffs' claim for restraint of trade under New York common law.[52] New York law prohibits a plaintiff from maintaining a class action under any statutory claim that imposes a penalty or minimum recovery. N.Y. C.P.L.R. 901(b). The Donnelly Act imposes such penalties and cannot be advanced on behalf of a class. N.Y. GEN. BUS. LAW § 340(5) (providing for treble damages); *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 831

N.Y.S.2d 760, 863 N.E.2d 1012, 1017 (2007). The Donnelly Act claim will be dismissed. Leave to amend will be denied as futile. *Grayson*, 293 F.3d at 108.

The IEU plaintiffs purport to assert a claim under the New York common law of restraint of trade. Plaintiffs have not identified any New York precedent supporting such a claim, i.e., independent of a statutory cause of action, and the court has found none. At least one New York district court has dismissed a similar claim for failure to "identify the distinct common law against restraints of trade" under which the plaintiffs wished to proceed. *See In re Digital Music Antitrust Litig.*, 592 F.Supp.2d 435, *447 n. 18 (S.D.N.Y. 2008). The court will therefore dismiss the IEU plaintiffs' claim for restraint of trade under the common law of New York. Plaintiffs may pursue this claim in a second amended complaint upon a clear showing that it is cognizable under New York law.

### ii. *Interstate Conduct as a Basis for Claims under State Law*

Defendants seek dismissal of the IEU and IPR plaintiffs' claims under the antitrust statutes of Nevada, South Dakota, Tennessee, West Virginia, and Wisconsin on the ground that these statutes apply only to intrastate commerce.

---

**50.** Defendants also challenge the IPR plaintiffs' claims under these state statutes and under Alabama and Mississippi law. The IPR plaintiffs have not responded to defendants' challenge to their state antitrust claims. This omission appears to be an oversight resulting from the IPR plaintiffs' anticipation of a second amended complaint naming additional parties to cure the alleged standing defects. *See supra* Part III.B.2.a. Defendants' motion to dismiss the claims under Alabama and Mississippi antitrust statutes will be denied without prejudice to their right to renew the motion after the IPR plaintiffs have filed a second amended complaint. *See supra* note 49.

**51.** Defendants move to dismiss claims brought by the IEU plaintiffs under the monopolization statutes of the District of Columbia, Michigan, and Minnesota. The IEU plaintiffs respond that their amended complaint erroneously cited these statutes. The motion will therefore be granted with respect to the monopolization claims, and the IEU plaintiffs may file a motion for leave to amend their complaint to rectify this deficiency.

**52.** The IEU plaintiffs also advance a claim under N.Y. GEN. BUS. LAW § 349, which is not affected by the motion to dismiss (Doc. 469).

## I. *Nevada*

 The Nevada Unfair Trade Practices Act ("NUTPA") proscribes anticompetitive conduct including price fixing and renders it "unlawful to conduct *any part* of any such activity" within the state. Nev. Rev.Stat. § 598A.060(1) (emphasis added). Hence, the statute creates a remedy against an interstate conspiracy that produces harm in Nevada. *See In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F.Supp.2d 404, 413–14 (D.Del.2007); *In re New Motor Vehicles Canadian Export Antitrust Litig. (NMV)*, 350 F.Supp.2d 160, 171–172 (D.Me.2004). In the instant matter, the IEU and IPR plaintiffs allege that the defendants engaged in a national price-fixing conspiracy that resulted in price increases in Nevada and elsewhere. The complaints therefore state a claim under the NUTPA.

## II. *South Dakota*

 The South Dakota antitrust statute states that "[a] contract, combination, or conspiracy between two or more persons in restraint of trade or commerce any part of which is within this state is unlawful." S.D. Codified Laws § 37–1–3.1. "The statutory language is ambiguous as to whether it is a part of the conspiracy or a part of the trade or commerce that must be within the state." *NMV*, 350 F.Supp.2d at 172; *see also Intel Corp.*, 496 F.Supp.2d at 414. Courts have resolved this ambigui-

ty by adopting the latter statutory interpretation. *Intel Corp.*, 496 F.Supp.2d at 414; *NMV*, 350 F.Supp.2d at 172. Therefore, a plaintiff must allege only that defendant's conduct produced anticompetitive effects within South Dakota. *NMV*, 350 F.Supp.2d at 172. Here, plaintiffs state a claim under South Dakota law by alleging a national conspiracy that produced increased prices in South Dakota.[53]

## III. *Tennessee*

 The Tennessee Trade Practices Act ("TTPA") forbids "[a]ll arrangements ... which tend to lessen [ ] full and free competition in the importation or sale of articles imported into this state ... or which tend to advance, reduce, or control the price ... of any such product or article...." Tenn.Code Ann. § 47–25–101. "[S]ubstantial effects" of the defendant's allegedly anticompetitive conduct must be felt within the state. *See Freeman Indus. v. Eastman Chem. Co.*, 172 S.W.3d 512, 523 (Tenn.2005). The TTPA creates a claim against all "anticompetitive conduct that decreases competition in or increases the price of goods paid by consumers in Tennessee" regardless of whether the goods arrive in consumers' homes exclusively through intrastate means. *NMV*, 350 F.Supp.2d at 173 (quoting *Sherwood v. Microsoft Corp.*, No. M2000–01850–COA–R9CV, 2003 WL 21780975, at *16 (Tenn. Ct.App. July 31, 2003)).[54] In the context

---

**53.** *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation (DRAM I)*, 516 F.Supp.2d 1072 (N.D.Cal.2007) is factually distinguishable. *DRAM I* dismissed a South Dakota claim because the plaintiffs alleged merely "that defendants' activities had 'a substantial effect on the foreign and interstate commerce'" without describing the effects within South Dakota. *Id.* at 1099. In the instant matter, however, the IPR and IEU plaintiffs allege that defendants' sold products in South Dakota, (Doc. 420 ¶¶ 49–63, 76; 422 ¶¶ 9–23), that they suppressed competition in the Indirect Purchaser States, which include

South Dakota, (Doc. 420 ¶ 157; Doc. 422 ¶ 107.a), and that they maintained prices at "noncompetitive levels throughout the United States and *in the Indirect Purchaser States*." (Doc. 422 ¶ 107.b (emphasis added); *see also* Doc. 420 ¶ 157). Plaintiffs have therefore alleged anticompetitive effects in South Dakota, and *DRAM I* does not require dismissal of the amended complaints.

**54.** Defendants rely upon *Medison America, Inc. v. Preferred Medical Systems*, 548 F.Supp.2d 567 (W.D.Tenn.2007) for the proposition that "[b]are allegations that prices

of Tennessee law, plaintiffs' allegations of a vast price-fixing conspiracy clearly articulate a viable state claim.

## IV. West Virginia

 The West Virginia Antitrust Act ("WVAA") outlaws "conspirac[ies] in restraint of trade or commerce in this State." W. Va.Code § 47–18–3(a). Substantive provisions of the WVAA must be interpreted consistently with federal law,[55] *Kessel v. Monongalia County Gen. Hosp.*, 220 W.Va. 602, 648 S.E.2d 366, 381 (2007) (applying per se antitrust rules and instructing courts to "harmonize" the WVAA with federal antitrust statutes), and federal courts have recognized that the Act applies to all anticompetitive conduct that produces in-state effects. *Intel Corp.*, 496 F.Supp.2d at 414; *NMV*, 350 F.Supp.2d at 175; *accord Buscher v. Abbott Labs.*, No. 94–C–755, slip op. at 2 (W. Va. Cir. Ct. Kanawha County Jan. 27, 1994) ("[T]he Antitrust Act prohibits a conspiracy that restrains West Virginia trade or commerce, regardless of the locus of the con-

spiracy."). Accordingly, plaintiffs may advance a WVAA action.

## V. Wisconsin

 Like other states, Wisconsin prohibits antitrust conspiracies "in restraint of trade or commerce." Wis. Stat. § 133.03(1). A plaintiff may bring an antitrust claim arising from conduct outside the state's borders if it " 'substantially affects' the people of Wisconsin and has impacts in th[e] state." *Meyers v. Bayer AG*, 303 Wis.2d 295, 735 N.W.2d 448, 451 (2007) (quoting *Olstad v. Microsoft Corp.*, 284 Wis.2d 224, 700 N.W.2d 139, 158 (2005)). The IEU and IPR plaintiffs' allegations of a national price-fixing conspiracy adequately state a claim under this statute.

## c. Sufficiency of Plaintiffs' Claims under State Consumer Protection Statutes

Defendants seek to dismiss the IEU plaintiffs' claims under the consumer protection laws of Arkansas, the District of Columbia, Kansas, Maine, New Mexico, and Rhode Island.[56]

---

were raised as a result of conduct is insufficient to establish that Tennessee commerce was substantially affected." *Id.* at 585. In *Medison America*, plaintiff alleged that defendants made disparaging statements about plaintiff's financial stability and customer service, which reduced competition for plaintiff's products. *Id.* However, *Medison America* did not involve price fixing or Sherman Act claims, and plaintiff failed to establish that defendants engaged in any anticompetitive conduct that raised prices in Tennessee. *Id.* In contrast, the IEU and IPR plaintiffs have alleged price-maintenance conduct that elevated the cost of chocolate products in Tennessee and nationwide. *See supra* Part III. B.1. Plaintiffs' alleged injury is therefore cognizable under the TTPA.

55. Although West Virginia looks to federal law when interpreting the WVAA, the prohibition against indirect purchaser recovery announced in *Illinois Brick* does not apply to

claims under the WVAA. *See California v. Infineon Techs. AG*, 531 F.Supp.2d 1124, 1154 (N.D.Cal.2007); *DRAM I*, 516 F.Supp.2d at 1097; *NMV*, 350 F.Supp.2d at 173–75.

56. All of these consumer protection statutes prohibit, *inter alia*, fraudulent or deceptive conduct. However, statutory prohibitions on consumer deception do not subsume conduct violative of the Sherman Act. *NMV*, 350 F.Supp.2d at 177 n. 22; *see also, e.g., Intel Corp.*, 496 F.Supp.2d at 417–18 (allowing consumer protection claims to proceed alongside antitrust allegations because plaintiffs alleged that defendant actively concealed incompatibilities between its products and those of its competitors). Consequently, the court will address each state consumer protection claim to determine: (1) whether anticompetitive conduct falls within the ambit of the statutory language or (2) whether the IEU plaintiffs have alleged those additional facts

### i. *Arkansas*

■ The Arkansas Deceptive Trade Practices Act ("ADTPA") prohibits any "unconscionable" trade conduct as well as "false[ ] or deceptive act[s] or practice[s] in business commerce or trade." ARK.CODE ANN. § 4–88–107(a)(10). The Act does not define the extent of "unconscionable" conduct; however, the Supreme Court of Arkansas has concluded that use of "the word[ ] . . . 'unconscionable' . . . illustrates that a liberal construction of the [A]DTPA is appropriate." *State ex rel Bryant v. R & A Inv. Co.*, 336 Ark. 289, 985 S.W.2d 299, 302 (1999) (rejecting argument that the unconscionability provision of the ADTPA rendered the statute too broad to be enforced).[57] The statute reaches any action that "show[s] no regard for conscience[,] affronting the sense of justice, decency, or reasonableness." *NMV*, 350 F.Supp.2d at 178 (quoting BLACK'S LAW DICTIONARY 1561 (8th ed. 2004)); *see also In re Dynamic Random Access Memory (DRAM) Antitrust Litig. (DRAM I)*, 516 F.Supp.2d 1072, 1109 (N.D.Cal.2007) (adopting *NMV*'s construction of the ADTPA). Hence, courts have concluded that claims of price fixing are cognizable under the Act. *DRAM I*, 516 F.Supp.2d at 1109 (permitting indirect purchaser claims to proceed under the ADTPA in a Sherman Act case); *NMV*, 350 F.Supp.2d at

178 (allowing indirect purchaser plaintiffs to maintain an ADTPA claim based upon an alleged conspiracy to keep Canadian-manufactured vehicles from entering the U.S. automobile market). The IEU plaintiffs will be permitted to advance an ADTPA claim.

### ii. *District of Columbia*

■■ The District of Columbia Consumer Protection Procedures Act ("DCCPPA") proscribes a litany of trade practices involving deception of consumers. D.C.CODE § 28–3904. The Act's prohibitions are not exclusive, however, and the DCCPPA does not require a showing of concealment or deception to support a claim. *Dist. Cablevision Ltd. v. Bassin*, 828 A.2d 714, 723 (D.C.2003) (allowing plaintiffs to maintain a DCCPPA claim associated with allegedly excessive late fees despite a lack of deception or fraud); *see also Calvetti v. Antcliff*, 346 F.Supp.2d 92, 103 (D.D.C.2004) ("The [DCCPPA] . . . is a comprehensive statute designed to provide . . . remedies for a broad spectrum of practices which injure consumers." (quoting *Bassin*, 828 A.2d at 722–23)). "Trade practices that violate other laws, including the common law, also fall within the purview of the [DCCPPA]." *Bassin*, 828 A.2d at 723; *Atwater v. D.C. Dep't of*

---

necessary to plead a cause of action thereunder.

**57.** *Bryant*, which challenged an allegedly usurious contract, applied contract-law principles of unconscionability. 985 S.W.2d at 302 (stating that unconscionability in contract law requires analysis of "whether there is a gross inequality of bargaining power between the parties to the contract and whether the aggrieved party was made aware of and comprehended the provision in question"). However, *Bryant* provides little guidance on the ADTPA outside of the contract arena. Federal courts addressing antitrust claims have therefore relied upon broader definitions of unconscionability. *DRAM I*, 516

F.Supp.2d at 1109; *NMV*, 350 F.Supp.2d at 178. Defendants contend that application of broad unconscionability principles is inappropriate under *In re Graphics Processing Units Antitrust Litigation (GPU)*, 527 F.Supp.2d 1011 (N.D.Cal.2007), which relied exclusively upon *Bryant*'s contract law analysis. *Id.* at 1029–30. The court concludes that the broader views of *NMV* and *DRAM I* represent the most reasonable interpretation of the Arkansas statute in the antitrust context, particularly in light of *Bryant*'s admonition that a "liberal construction of the [A]DPTA is appropriate." *Bryant*, 985 S.W.2d at 302.

*Consumer & Regulatory Affairs,* 566 A.2d 462, 465 (D.C.1989) (restating that the DCCPPA is designed to "assure that a just mechanism exists to remedy *all* improper trade practices." (quoting D.C.Cᴏᴅᴇ § 28–3901(b)(1))). Hence, the DCCPPA subsumes a Sherman Act claim and creates an indirect purchaser cause of action for conspiratorial price fixing regardless of whether defendants have engaged in deceptive conduct. *See Osbourne v. Capital City Mortgage Corp.,* 727 A.2d 322, 326 (D.C.1999); *see also TFT–LCD,* 586 F.Supp.2d at 1126; *NMV,* 350 F.Supp.2d at 183. For these reasons, defendants' motion to dismiss the DCCPPA is denied.

### iii. *Kansas*

■ The Kansas Consumer Protection Act ("KCPA") provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction. An unconscionable act or practice violates this act whether it occurs before, during or after the transaction." Kᴀɴ. Sᴛᴀᴛ. Aɴɴ. § 50–627(a). Defendants, as manufacturers and distributors of chocolate candy, qualify as "supplier[s]" within the meaning of the Act. *Id.* § 50–624(j). Despite the KCPA's seemingly broad language, the Supreme Court of Kansas has distinguished between consumer harms redressable thereunder and pricing harms governed by the Kansas antitrust statute. *Equitable Life Leasing Corp. v. Abbick,* 243 Kan. 513, 757 P.2d 304, 306–08 (1988) (holding that, while punitive damages were proper under antitrust law,[58] the plaintiff could not recover them under the KCPA, which is designed to redress other forms of consumer harm); *see also Maberry v. Said,* No. 94–2416, 1996 WL 157219, at *1 (D.Kan. Mar. 13, 1996) (stating that the

purpose of the KCPA "is to encourage aggrieved consumers with small claims to file suit" (quoting *Equitable Life,* 757 P.2d at 307)). The statute is therefore inapplicable to price-fixing claims such as those at issue in the present case. *See Schoenbaum v. E.I. DuPont De Nemours & Co.,* 517 F.Supp.2d 1125 (E.D.Mo.2007) (holding that the defendants' failure to inform consumers of collusive prices did not constitute a violation of the KCPA), *vacated in part on other grounds,* No. 4:05CV01108, 2007 WL 3331291 (Nov. 6, 2007); *Wille v. Sw. Bell Tele. Co.,* 219 Kan. 755, 549 P.2d 903, 907 (1976) (concluding that the KCPA is not designed to remedy "the consequences per se of uneven bargaining power or even a simple old-fashioned bad bargain"). Accordingly, the IEU plaintiffs' claim under the KCPA will be dismissed. Leave to amend will be denied as futile. *Grayson,* 293 F.3d at 108.

### iv. *Maine*

■ The Maine Unfair Trade Practices Act ("MUTPA") forbids "unfair methods of competition" as well as "unfair or deceptive ... conduct of any trade." Mᴇ. Rᴇᴠ.Sᴛᴀᴛ. Aɴɴ. tit. 5, § 207. A business practice is "unfair" if the injury it produces is (1) "substantial," (2) not "outweighed by any countervailing benefits to consumers or competition that the practice produces," and (3) not reasonably avoidable by consumers. *Tungate v. MacLean–Stevens Studios, Inc.,* 714 A.2d 792, 797 (Me.1998) (quoting *Suminski v. Me. Appliance Warehouse, Inc.,* 602 A.2d 1173, 1174 n. 1 (Me.1992)). In pricing cases, the allegedly unfair practice must also induce the consumer to acquire something that he or she would not otherwise have purchased. *Id.* The MUTPA creates no remedy in a case

---

**58.** *Equitable Life* compared the KCPA to the Kansas antitrust treble-damages statute, previously codified at Kᴀɴ. Sᴛᴀᴛ. Aɴɴ. § 50–801(b).

In 2000, the statute was re-codified at Kᴀɴ. Sᴛᴀᴛ. Aɴɴ. § 50–161(b) without substantive change.

involving collusive prices because higher prices cannot "induc[e individuals] to purchase something they would not otherwise purchase." [59] *TFT–LCD*, 586 F.Supp.2d at 1126; *accord In re Graphics Processing Units Antitrust Litig. (GPU)*, 527 F.Supp.2d 1011, 1031 (N.D.Cal.2007) ("[T]he *higher* prices plaintiffs allegedly paid ... because of the price-fixing conspiracy could not have induced plaintiffs to purchase [the defendants' products]."). The motion to dismiss the IEU plaintiffs' claims under the MUTPA will therefore be granted. Leave to amend will be denied as futile. *Grayson*, 293 F.3d at 108.

### v. *New Mexico*

 The New Mexico Unfair Practices Act ("NMUPA") censures both "unfair or deceptive" and "unconscionable trade practices." N.M. STAT. § 57–12–3. "Unconscionable trade practices" include all sales that either "take[ ] advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree" or "result[ ] in a gross disparity between the value received by a person and the price paid." *Id.* § 57–12–2(E). The NMUPA is primarily remedial in nature, and courts construe its provisions broadly to facilitate this purpose. *State ex rel. Stratton v. Gurley Motor Co.*, 105 N.M. 803, 737 P.2d 1180, 1185 (N.M.App.1987). Federal courts generally permit NMUPA actions in price-fixing cases provided that the plaintiff alleges a "gross disparity" between the price paid for a product and the value received. *See, e.g., TFT–LCD*, 586

**59.** In *NMV*, the United States District Court for the District of Maine concluded that *Tungate*'s consumer inducement criterion applies exclusively to claims brought under the MUTPA's prohibition on "unfair or deceptive acts" but not to "[u]nfair methods of competition." *NMV*, 350 F.Supp.2d at 187 n. 40 (quoting ME.REV.STAT. ANN. tit. 5 § 207). The court declines to adopt *NMV*'s construction of *Tungate*.

Although *Tungate* did not involve price fixing, it nevertheless provides a fitting analysis for cases involving collusive pricing. *Tungate* addressed the legality of artificially elevated prices resulting from sales commissions that the defendant added to a product's purchase price without disclosure. The court did not parse the statutory language in the manner suggested by *NMV*. Rather, it assessed whether consumers changed their behavior as a result of the defendant's pricing tactics. *Tungate*, 714 A.2d at 797 ("The higher price ... does not operate to induce customers to purchase [products] they would not otherwise purchase if no commission were paid and prices were 20% lower....").

The decisions cited by *Tungate* confirm that a *change in consumer conduct* forms the marrow of a MUTPA violation. For example, *Tungate* relied upon *Kazmaier v. Wooten*, 761 F.2d 46 (1st Cir.1985), in which the court applied Massachusetts's equivalent of the MUTPA. *Kazmaier*, 761 F.2d at 51; *see also*

MASS. GEN. LAW. ch. 93A § 2. *Kazmaier* determined that unfairness requires a detrimental change in consumer behavior as a result of confusion fomented by the defendant. *Id.* at 51 (concluding that customers suffered no unfairness when their "compulsion to buy or not buy [] would scarcely be altered by any mistake" resulting from the defendant's conduct). The remaining cases cited in *Tungate* conducted a similar analysis. *See FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir.1988) (affirming grant of a preliminary injunction against unfair trade practices in which customers were induced to purchase products through advertisements reflecting inaccurately low prices); *Resort Car Rental Sys. v. FTC*, 518 F.2d 962, 963 (9th Cir.1975) (concluding that a defendant violated the Federal Trade Act by soliciting customers through a deceptively low price). A pricing claim under the MUTPA therefore requires proof that the defendant induced consumers to alter their behavior to their detriment.

Except in unusual circumstances, higher prices do not induce consumers to purchase products. *TFT–LCD*, 586 F.Supp.2d at 1126; *GPU*, 527 F.Supp.2d at 1031. Accordingly, the court adopts the position of those tribunals that have dismissed MUTPA claims in price-fixing cases. *See TFT–LCD*, 586 F.Supp.2d at 1126; *GPU*, 527 F.Supp.2d at 1031.

F.Supp.2d at 1127; *Intel Corp.*, 496 F.Supp.2d at 418; *NMV*, 350 F.Supp.2d at 196. Allegations that a plaintiff has paid approximately 30% more for a product as a result of price fixing are sufficient to plead a NMUPA claim, *NMV*, 350 F.Supp.2d at 196, as are averments that a conspiracy produced "significant artificial increases in [product] price," *TFT–LCD*, 586 F.Supp.2d at 1127. The IEU plaintiffs allege that they paid "artificially inflated prices for" chocolate candy products, (Doc. 420 ¶ 4), that defendants stabilized prices at non-competitive levels, (*id.* ¶ 122.b), and that plaintiffs "paid more for [chocolate candy] products than they would have paid in the absence of [the alleged] antitrust violations," (*id.* ¶ 197). These allegations adequately plead a claim under the NMUPA, and the motion to dismiss will be denied with respect to this claim.[60]

### vi. *Rhode Island*

■ The Rhode Island Unfair Trade Practice and Consumer Protection Act ("RIUTPCPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." R.I. GEN. LAWS § 6–13.1–2. The statute enumerates twenty methods of unfair or deceptive competition, including conduct that "creates a like-lihood of confusion or of misunderstanding." *Id.* § 6–13.1–1(6)(xii). A plaintiff possesses standing to advance a RIUTPCPA claim if he or she "purchases or leases goods or services primarily for personal, family or household purposes." *Id.* § 6–13.1–5.2(a). The following factors determine whether a trade practice qualifies as "unfair" under the RIUTPCPA: (1) whether the practice affronts public policy, as delineated by the common law, statutes, and "other established concept[s] of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." *Ames v. Oceanside Welding & Towing Co.*, 767 A.2d 677, 681 (R.I.2001) (quoting *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244–45 n. 5, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972)). These factors encompass price-fixing injuries, and consumers subject to collusive pricing possess a cognizable claim under the RIUTPCPA. *See, e.g.*, *TFT–LCD*, 586 F.Supp.2d at 1129–30; *In re Dynamic Random Access Memory (DRAM) Antitrust Litig. (DRAM II)*, 536 F.Supp.2d 1129, 1144–45 (N.D.Cal.2008) (observing that price fixing is "likely to offend public policy[,]" as reflected by statutes proscribing anticompetitive activity).[61]

---

**60.** Defendants rely upon *GPU*, which dismissed claims under the consumer protection statutes of Arkansas, the District of Columbia, Kansas, and New Mexico on the ground that price fixing does not constitute unconscionable conduct. 527 F.Supp.2d at 1030. *GPU*, however, failed to address the decisions of other federal courts that permitted price-fixing claims to proceed under the statutes of Arkansas, the District of Columbia, and New Mexico. *See, e.g., DRAM I*, 516 F.Supp.2d at 1109; *NMV*, 350 F.Supp.2d at 178, 183, 196. The court adopts the reasoning of the latter cases, which evince a compelling trend favorable to consumer protection claims in price-fixing actions.

**61.** This conclusion resonates with *ERI Max Entertainment, Inc. v. Streisand*, 690 A.2d 1351 (R.I.1997), which defendants invoke in support of their motion to dismiss. *ERI* considered, *inter alia*, claims under the RIUTPCPA and for unfair competition under Rhode Island common law. The defendants misapprehend the holding in *ERI*. Addressing the unfair competition claim, the court held that "a finding of unfair competition must be predicated upon conduct ... that reasonably tended to confuse and mislead the general public into purchasing [the defendant's] product when the actual intent of the purchaser was to buy the product of [another]." *Id.* at 1354 (quoting *George v. George F. Berkander, Inc.*, 92 R.I. 426, 169 A.2d 370, 371 (1961)).

■ In the instant matter, the IEU plaintiffs allege that defendants conspired to raise prices in Rhode Island (Doc. 420 ¶ 174.c), that they issued misleading statements about the true reasons for these price increases, (*id.* ¶ 174.e), and that they caused Rhode Island consumers to believe that prices for chocolate candy were the result of fair competition in an open marketplace, (*id.* ¶ 174.f.) The IEU plaintiffs further allege that they purchased defendants' products for personal, family, or household use. (*Id.* ¶ 174.g.) These allegations adequately plead a cause of action under the RIUTPCPA, and the motion to dismiss this claim will be denied. *See, e.g., DRAM II*, 536 F.Supp.2d at 1145 (refusing to dismiss RIUTPCPA claim because plaintiffs alleged that defendant "engaged in 'unfair or deceptive' acts" that "mis[led] or deceive[d]" consumers and resulted in injury to Rhode Island consumers).

### d. *Unjust Enrichment*

■ Defendants lastly move to dismiss the IPR and IEU plaintiffs' claims for unjust enrichment. Neither complaint identifies the state jurisdictions upon whose law plaintiffs predicate these claims.[62] Restitution remedies vary considerably from state to state. *See, e.g., Powers v. Lycoming Engines*, 245 F.R.D. 226, 231 (E.D.Pa.2007) (describing four discrete approaches to restitution claims); *Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 500–01 (N.D.Ill.1999) (recounting variations among states' common law of restitution). Moreover, the availability of relief in an antitrust case may depend upon whether a particular state has adopted an *Illinois Brick* repealer or whether it limits antitrust recovery to compensatory damages. Several courts presented with generic restitution claims have required plaintiffs to identify at the pleading stage those states under whose law they advance their claims. *See, e.g., TFT–LCD*, 586 F.Supp.2d at 1124; *SRAM*, 580 F.Supp.2d at 910; *DRAM II*, 536 F.Supp.2d at 1145 (concluding that plaintiffs' complaint was inconsistent with Rule 8 pleading standards because it neglected to identify the states under whose law they brought their unjust enrichment claims).

The court finds logic in this approach and will therefore dismiss the unjust enrichment claims. The IPR and IEU plaintiffs will be permitted to pursue these claims in the form of a second amended complaint provided, however, that they clearly identify the state jurisdictions invoked therein.

### IV. *Conclusion*

The Rule 12(b)(2) defendants' motions will be deferred during a period of jurisdictional discovery, which will be governed by a Case Management Order accompanying this memorandum. The remaining defendants' Rule 12(b)(6) motions will be denied except with respect to the claims

Contrary to the defendants' contention, the court imposed no similar restriction on claims under the RIUTPCPA, which is "intended to declare unlawful a broad variety of activities that are unfair or deceptive." *Park v. Ford Motor Co.*, 844 A.2d 687, 692 (R.I. 2004). Moreover, the restrictive language in *ERI* regarding unfair competition derives from *George*, which was decided approximately eight years before the enactment of the RIUTPCPA and addressed a common law unfair competition claim. *George*, 169 A.2d at 371. While the RIUTPCPA provides a statutory remedy for such claims, its reach is not limited to the common law, *see Park*, 844 A.2d at 692, and the IEU plaintiffs may invoke it as a basis for the instant claim, *DRAM II*, 536 F.Supp.2d at 1144–45.

**62.** To the extent plaintiffs rely upon federal common law, *Illinois Brick* precludes the claim. *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 744–47, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); *NMV*, 350 F.Supp.2d at 211.

under the New York Donnelly Act, the KCPA, the MUTPA, New York common law of restraint of trade, and unjust enrichment. Leave to amend the first three claims will be denied as futile. The IEU and IPR plaintiffs may move for leave to file a second amended complaint consistent with the limitations set forth in this memorandum.

An appropriate order follows.

### ORDER

AND NOW, this 4th day of March, 2009, upon consideration of the motions to dismiss (Docs.464, 466, 469, 471, 473, 474, 476), and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1. The motions to dismiss (Docs. 466, 471, 473, 474) pursuant to Rule 12(b)(2) filed by defendants Cadbury plc, Cadbury Holdings, Mars Canada, Nestlé S.A., and Nestlé Canada are DEFERRED pending completion of jurisdictional discovery. Jurisdictional discovery shall be conducted in accordance with Case Management Order No. 9, issued simultaneously herewith.

2. The motion to dismiss (Doc. 469) the amended complaints of the indirect end users and the indirect purchasers for resale pursuant to Rule 12(b)(6) is GRANTED in part, DENIED in part, DENIED as moot in part, and DEFERRED in part as follows:

 a. The motion is GRANTED in part, DENIED in part, and DENIED as moot in part as follows:

 i. The motion is GRANTED with respect to the claims against defendants Cadbury Adams Canada, The Hershey Company, Hershey Canada, Mars, Mars Snackfood U.S., and Nestlé U.S.A. under the following law:

 I. D.C.CODE § 28–4503.

 I. MICH. COMP. LAWS § 443.773.

 III. MINN.STAT. § 325D.52.

 IV. New York Donnelly Act, N.Y. GEN. BUS. LAW § 340.

 V. Kansas Consumer Protection Act ("KCPA"), KAN. STAT. ANN. §§ 50–623 to –643.

 VI. Maine Unfair Trade Practices Act ("MUTPA"), ME.REV.STAT. ANN. tit. 5, §§ 205–A to 214.

 VII. New York common law of restraint of trade.

 VIII. The common law of unjust enrichment.

 Leave to amend is denied as futile with respect to the claims identified in Clauses I–VI above. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir.2002). Plaintiffs may request leave to file a second amended complaint alleging the claims identified in Clauses VII and VIII in accordance with Paragraph 5.

 ii. The motion is DENIED as moot with respect to the claims against Cadbury Adams Canada, The Hershey Company, Hershey Canada, Mars, Mars Snackfood U.S., and Nestlé U.S.A. under the following statutes:

 I. HAW.REV.STAT. §§ 480–1 to –24.

 II. N.Y. GEN. BUS. LAW §§ 340–47.

 III. N.J. STAT ANN. §§ 56:9–1 to –19.

 IV. 740 ILL. COMP. STAT. §§ 10/1–/12.

 iii. The motion is DENIED with respect to all other claims against Cadbury Adams Canada, The Hershey Company, Hershey Canada,

Mars, Mars Snackfood U.S., and Nestlé U.S.A.

b. The motion is DEFERRED with respect to Cadbury plc, Cadbury Holdings, Mars Canada, Nestlé S.A., and Nestlé Canada pending a ruling on these defendants' motions to dismiss pursuant to Rule 12(b)(2).

3. The motion to dismiss (Doc. 476) the amended complaints of the direct purchasers and individual plaintiffs pursuant to Rule 12(b)(6) is DENIED in part and DEFERRED in part as follows:

a. The motion is DENIED with respect to Cadbury Adams Canada, The Hershey Company, Hershey Canada, Mars, Mars Snackfood U.S., and Nestlé U.S.A.

b. The motion is DEFERRED with respect to Cadbury plc, Cadbury Holdings, Mars Canada, Nestlé S.A., and Nestlé Canada pending a ruling on these defendants' motions to dismiss pursuant to Rule 12(b)(2).

4. The supplemental motion to dismiss (Doc. 464) pursuant to Rule 12(b)(6) filed by Cadbury plc, Cadbury Holdings, and Cadbury Adams Canada is DENIED in part and DEFERRED in part as follows:

a. The motion is DENIED with respect to Cadbury Adams Canada.

b. The motion is DEFERRED with respect to Cadbury plc and Cadbury Holdings pending a ruling on these defendants' motions to dismiss pursuant to Rule 12(b)(2).

5. Following complete disposition of the pending motions to dismiss, the indirect end users and indirect purchasers for resale may file a second amended complaint for the purposes of:

a. Adding parties who reside or transact business in states under whose law plaintiffs bring their claims.

b. Describing the business activities in Iowa and Nebraska of indirect purchaser for resale Treat America Limited.

c. Replacing the citations to state monopolization statutes in the indirect end users' current complaint with citations to statutes governing horizontal restraints.

d. Reinstating the indirect end users' claims under the New York common law of restraint of trade. Any motion requesting leave to reassert this claim shall identify legal authority supporting the claim.

e. Reinstating a claim for unjust enrichment. Any motion requesting leave to reassert this claim shall identify the jurisdiction under whose law the claim arises.

The second amended complaint shall be filed within fifteen (15) days after the court's ruling on the motions. In the absence of a second amended complaint, defendants shall be permitted to renew their motion to dismiss plaintiffs' claims under the state antitrust statutes of Alabama and Mississippi.

6. No discovery shall be taken in this above-captioned matter prior to complete disposition of the motions deferred hereunder unless authorized by Case Management Order No. 9.